[Civ. No. 21435. Third Dist. Nov. 24, 1982.]

BILLY WADE DAVIS, Plaintiff and Appellant, v.
CITY OF SACRAMENTO et al., Defendants and Respondents.

**COUNSEL**

David P. Mastagni, Donald S. Pressley and Kenneth R. Hulse for Plaintiff and Appellant.

James P. Jackson, City Attorney, Samuel L. Jackson and Stephen B. Nocita, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**EVANS, J.**—Plaintiff appeals an adverse judgment which denied his petition for writ of mandate and determined that certain Sacramento City Charter provi-

sions were constitutional. Plaintiff, a Sacramento police officer from 1968 to 1979, retired for industrially incurred mental disability. The matter was submitted on stipulated facts and medical reports. The proceeding challenged the constitutionality of sections 413 and 415 of the Sacramento City Charter. Those sections provide:

Section 413: "Any member of this plan who becomes incapacitated for the performance of his duty by reason of any bodily injury or physical illness caused by or incurred in performance of his duty shall be retired on an industrial disability retirement if the incapacity of the member is of an extended and uncertain duration."

Section 415: "Any member of this plan who becomes incapacitated for the performance of his duties by reason of bodily injury or physical or *mental illness* and who has completed ten (10) years of service in the aggregate shall be retired on an ordinary disability retirement allowance if the incapacity of the member is of an extended and uncertain duration and the member is not entitled to an industrial disability retirement." (Italics ours.)

The stipulation, entered by the parties upon which the administrative hearing and the superior court review proceedings were conducted, provides in part: "(b) It is further expressly and knowingly agreed that, unless and until there is a final judicial determination that the exclusion of mental illness from Section 413 is unconstitutional, no evidence shall be presented by or on behalf of any party hereto, other than this stipulation and the medical records and reports annexed hereto as Exhibit 'A' and incorporated herein by reference."

The sole question tendered on appeal, which was carefully considered by the trial court, is the constitutionality of the quoted sections.

We adopt as our opinion that portion of the well reasoned opinion of Judge Sapunor of the Sacramento Superior Court which correctly resolved the constitutional issue in this case. The applicable portion of that opinion reads as follows:

"The provisions of the Sacramento City Employees' Retirement System became a part of the Charter after lengthy negotiations which included City management, employees, employee representatives, and a vote of the electorate. Section 413, the industrial disability retirement section, and Section 415, the ordinary disability retirement section, are part of what is known as the 'section 399 plan'.

"Both the Fourteenth Amendment of the United States Constitution and the equal protection clause of the California Constitution accord any person the

equal protection of laws in plain and unequivocal language and without qualification.

"In determining the constitutional validity of the pension provisions, this Court must first consider which of two standards of review it shall employ to reach a decision in this case. ■■■ The basic or standard method of reviewing legislation in which there is a differentiation or discrimination of treatment among individuals or classes, particularly in reviewing economic or social welfare legislation, is the 'rational relationship test'. Under this standard, the party attacking the classification bears the burden of proving that it has no reasonable basis or bears no rational relationship to a conceivably legitimate state purpose.

"The second and more rigorous test requires the Court to perform an active and critical analysis of the classification under attack. This 'strict scrutiny' standard of review is employed in cases involving classifications which are suspect, such as those based on race or sex. Fundamental rights, as defined in *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242], are also examined under strict scrutiny. ■■■ The California Supreme Court has determined that retirement benefit rights, including pensions, whether for age and service, or disability or death are vested and fundamental rights. [*Dickey* v. *Retirement Board* (1976) 16 Cal.3d 745, 748, 750 (129 Cal.Rptr. 289, 548 P.2d 689).] Pension rights of police officers provided by city charters are considered part of their compensation, serve as incentives toward public service, and vest at the time of their employment. [*Dickey, supra*, p. 749.] ■■■ However, not all limitations or incidental burdens on such a right have a significant effect, and where only an incidental effect occurs, strict scrutiny is unnecessary. [*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal. 3d 33 [157 Cal.Rptr. 855, 599 P.2d 46).] It is fundamental that a legislative body must classify among classes and individuals whenever there is a rational justification for diversity of treatment if the law is to apply equally to all persons. Because a law is designed to operate on a particular class of persons does not necessarily mean it operates to deny equal protection within the meaning of the constitutional guaranty. The Constitution doesn't guarantee uniform treatment, it guarantees that diversity of treatment shall have a rational basis, a rational relationship, to a legitimate government purpose.

■■■ "Legislative bodies are invested, necessarily, with wide discretion to classify, and a reviewing court must proceed upon the presumption that a classification is valid. Applying the rational relationship standard, if any stated facts reasonably provide the Court with a rationale to sustain a classification, the Court will presume the existence of that state of facts. If a legislative body has determined the existence of a sufficient distinction to warrant a classifica-

tion, it will not be overruled by the Court unless it is clearly arbitrary and erroneous.

"In the case at bench, petitioner was found to be suffering from a mental disorder which disabled him from further service as a police officer. His fundamental vested right to a disability pension was not denied. Petitioner was awarded an 'ordinary' disability pension. Petitioner disputes here the value or extent of the protection provided him by the municipalities' [*sic*] legislative enactment. He does not protest exclusion from disability pension plan coverage, but attacks the range of benefits provided by the plan for his particular kind of disability, objecting that the inclusion of mental disability as an ordinary disability which is compensated at a lower rate of benefits than a nonmental industrial disability is a denial of equal protection and due process. Petitioner is not being treated differently from pensioned employees who also suffer a mental disability and complains that he and all other mentally disabled pensioned City employees should be granted not ordinary disability retirement benefits, but instead, more generous industrial disability retirement benefits.

"Under these circumstances, this court must deal with the constitutional propriety of a legislative classification in the area of economic and social welfare, not with the denial of a fundamental vested right. The merits of such a legislative classification must be evaluated by the rational relationship test. Under the due process clause, the test of such a legislative classification is whether the classification bears a rational relationship to a constitutionally-permissible objective. The two tests are approximately the same, and the party challenging the classification has the burden of proving it unreasonable or irrational. [*McGowan* v. *Maryland* (1961) 366 U.S. 420, 425-426 (6 L.Ed.2d 393, 398-399, 81 S.Ct. 1101).]

"In substance, petitioner asks this Court to rule that benefits given to disabled employees in one category must be given to all disabled employees in all categories. In *Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833 [48 Cal.Rptr. 481, 409 P.2d 481], the Supreme Court said 'The Legislature is not bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulations to those classes of cases in which the need is deemed to be most evident.'

"In the evidence presented to the Court for review pursuant to the stipulation of the parties is the opinion of C. T. Brothers, Ph.D. which recites that 'Testing reveals, however, that he (petitioner) is extremely capable intellectually and he should be rehabilitated in a career more nearly suited to his personality and temperament. A profile of his vocational interest pattern is enclosed. His present condition does not appear to be entirely the result of his employment,

although features of his work undoubtedly aggravated his condition. Other predisposing significant factors include childhood traumas and hardships.' The opinion of Barry S. Ramer, M.D. the psychiatrist who referred petitioner to Psychologist Brothers for psychological testing contains the information that petitioner 'has the intellectual capacity to excel in this type of career and at this time he is motivated to continue in the career. However, with his intellectual capacities, he certainly could prevail in some other occupational endeavor of his choice. . . . At the present time, I found nothing which would lead me to believe that the man was incapable of continuing to perform his duties. It might be very helpful, however, if he were assigned to a supervisor who was understanding and supportive since he so badly needs this kind of emotional help. Under the proper supervisor, Mr. Davis could be an excellent police officer and a credit to his department, as well as himself.' The quotation immediately above is taken from Dr. Ramer's report to Ms. Bernardine Barre, dated January 13, 1978. In a later report dated February 28, 1979, addressed to petitioner's then attorney, Dr. Ramer can be quoted as saying, 'I believe that Mr. Davis is totally and permanently disabled from functioning as a police officer. I think Mr. Davis was a poor candidate to begin with for a police officer. I would imagine that if the City of Sacramento had some form of psychological screening process, this man probably would have been screened out, despite his high level of intellect and his high level of interest.' In that same letter, Dr. Ramer recommended, 'The patient should be medically retired from police services. The patient should be directed toward vocational testing and preference testing. He should be directed into a new career. It is likely that he can be very successful at other occupations and endeavors, but it is also just as likely that without adequate psychiatric treatment he will have recurrences of his depression similar to the recent one. Thus, I feel there are even some elements of disability for open competitive labor.' John A. Stroud, M.D., made a diagnostic assessment of petitioner upon the request of Dr. Robert White. Dr. Stroud's conclusion was that, 'As every observer has noted, this man is quite bright, insightful and possessed of cognitive facilities (*sic*) which should enable him to engage in nearly any pursuit he chooses . . . interestingly, Mr. Davis' overall interest patterns are very similar to police officers in as we might expect after nearly ten years of service, but his personality configuration is very dissimilar. On this basis alone, a purely objective assessment would not advise a return to police work, unless it involved work which is more administrative-management than direct enforcement.' Dr. C. Jess Groesbeck, M.D. reported on August 18, 1977 that petitioner 'was totally and temporarily disabled last year, but now he has returned to work and it is felt that he should continue to receive treatment and evaluate carefully, during the next six months to a year whether he should in fact remain on police duty. It is this examiner's opinion that the time may come when he will have to consider another occupation totally. There is no question, but what he has received an industrially associated injury. A serious overwhelming depression with marked anxiety and combat fatigue. There is no

pre-existent causation. It is all industrially related.' Arnold J. Lowell, M.D. reported to petitioner's present attorney on April 12, 1979, that 'The question of underlying psychopathology, or pre-existing personality predisposition has been raised. The etiology of severe depressive illnesses is not always clear. Many times these illnesses are multifactorial in origin. Socio-environmental and psychodynamic factors may be involved, as well as biochemical, genetic, and neurophysiologic factors. These elements may interact in an individual in complex ways. The specific etiology is often difficult to state with certainty. It is clear however, that Mr. Davis reacted in a violent and depressive way to both specific and cumulative stresses of his work. Had he not been exposed to these stresses, it is likely that Mr. Davis would have been spared the overwhelming depressive illness which has disabled him.'

"The excerpts from medical opinions submitted in evidence are quoted because they illustrate clearly the uncertainty of psychiatric and psychological diagnoses. The Supreme Court has recognized the difficulty of diagnosing mental illness. In *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352], the Court commented, 'It must be conceded that psychiatrists still experience considerable difficulty in confidently and accurately diagnosing mental illness.' The above-quoted excerpts from medical reports stipulated into evidence by the parties illustrate the difficulty of mental disability diagnosis contrasted with the ability to determine whether a physical illness or bodily injury is disabling or job related. Simulation of mental illness is simple and its detection difficult as witness the example given by the Supreme Court in *Burnick* [*Burnick, supra,* p. 326, fn. 16]:

"'The point has been dramatically illustrated by a recent experiment conducted by a Dr. D. L. Rosenhan, Professor of Psychology and Law at Stanford University. Eight sane people, including three psychologists, a psychiatrist, and a pediatrician, applied for admission to twelve different mental hospitals, feigning only to have heard voices saying "empty," "hollow," and "thud." In every other aspect the pseudo-patients behaved normally and furnished the examining physicians their actual life histories. Yet all twelve institutions admitted them as patients: of the twelve admissions, eleven were diagnosed as schizophrenic, and one as manic-depressive. In other words, every one was incorrectly diagnosed as suffering from a severe mental illness. Moreover immediately upon admission all of the pseudo-patients ceased simulating any symptoms of abnormality. Yet when they were eventually released, none was deemed "cured"; each was discharged rather, with a diagnosis of schizophrenia "in remission." In short, each pseudo-patient "was not sane, nor, in the institution's view, had he ever been sane".'

■ "Here, then, this Court is presented with a rational basis upon which respondent City could choose to exclude mental disorder or illness under the

provisions of Charter Section 413 providing for industrial disability benefits and include it rather in Charter Section 415 providing for ordinary disability benefits.

"Furthermore, the variable existing between industrial and ordinary disability pension benefits pursuant to the Charter may be rationally based upon an economic policy related to the disabilities which the plan seeks to cover. The selective classification of benefits payable in a retirement system has been approved constitutionally by the Supreme Court of the United States. In *Geduldig,* 417 U.S. at 484, 494 [41 L.Ed.2d 256, 263, 94 S.Ct. 2485], the United States Supreme Court said, Each of these 'variables'—the benefit level deemed appropriate to compensate employee disability, the risks selected to be insured under the program, and the contribution rate chosen . . . represent a policy determination by the state. And in *Dandridge* v. *Williams* (1970) 397 U.S. 471, at 484 [25 L.Ed.2d 491, 501, 90 S.Ct. 1153], the United States Supreme Court held that where a classification has some reasonable basis, it does not offend constitutional principles merely because it was not made 'with mathematical nicety or because in practice it results in some unequality.' Again, at page 487 [25 L.Ed.2d at page 503] in *Dandridge, supra,* the Supreme Court of the United States said '. . . the Constitution does not empower this court to second guess state officials charged with the difficult responsibility of allocating limited . . . funds among a myriad of potential recipients.'

"It is evident that the totality comprehensive program which petitioner seeks would be substantially more costly to respondent and plan members than the present program and would inevitably require a higher rate of employee contribution, a lower scale of benefits for those suffering insured disabilities, or some combination of these measures.

"'There is nothing in the Constitution, however, that requires the State to subordinate or compromise its legitimate interest solely to create a more comprehensive program than it already has. The State has a legitimate interest in maintaining the self-supporting nature of its insurance program. Similarly, it has an interest in distributing available resources in such a way as to keep benefit payments at an adequate level for disabilities that are covered, rather than to cover all disabilities inadequately. Finally, California has legitimate concern in maintaining a contribution rate at a level that will not unduly burden participating employees.' [*Geduldig, supra,* at pp. 494-496 (41 L.Ed.2d at pp. 263-264).]

"It cannot be said that respondent City's legislative actions are unreasonable, irrational, erroneous or arbitrary under the circumstances of this case.

"This lengthy Memorandum of Intended Decision would end here were it not for petitioner's allegations seeking an award of attorney's fees. Code of Civil Procedure Section 1021.5 permits the Court upon motion to award attorney's fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting public interest under certain conditions which are specified in the statute. Since on the facts and the law, this Court's ruling must be against petitioner. He is not entitled to attorney's fees under that section.

"Sections 413 and 415 of the Charter, construed separately or together, do not violate the equal protection or due process clauses of the United States or California Constitutions."

The judgment is affirmed.

Puglia, P. J., and Regan, J., concurred.

A petition for a rehearing was denied December 23, 1982.