[No. E018521. Fourth Dist., Div. Two. Dec. 11, 1997.]

DEWAYNE HUDSON et al., Plaintiffs and Appellants, v.
BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES'
RETIREMENT SYSTEM et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.B.

**COUNSEL**

Silver, Hadden & Silver and Stephen H. Silver for Plaintiffs and Appellants.

Kayla J. Gillan, F. Javier Plasencia, Franscell, Strickland, Roberts & Lawrence, Barbara A. Roberts, Priscilla F. Slocum and Ann M. Maurer for Defendants and Respondents.

**OPINION**

**RICHLI, J.**—Appellants are the former fire chief, division fire chief, police chief, and substation superintendent of the electric utility division of the City of Colton (City). The City permitted appellants to convert employer-paid benefits, such as health and life insurance, to salary increases if they agreed to retire within 12 months. The purpose of the conversions was to increase appellants' final year compensation so they would receive greater retirement benefits under the Public Employees' Retirement System (PERS).

PERS, however, refused to include the salary increases in calculating appellants' pensions, taking the position the benefit conversions were not "compensation" under the Public Employees' Retirement Law (PERL). In the published part of this opinion we conclude the lower court correctly determined the benefit conversions were excluded from compensation under the then applicable provisions of PERL.

I

**FACTUAL AND PROCEDURAL BACKGROUND**

PERL (Gov. Code, § 20000 et seq.) establishes PERS, a retirement system for employees of the state and participating local public agencies. PERS determines employees' retirement benefits based on their years of service, final compensation, and ages at retirement. The system is funded by employer and employee contributions calculated as a percentage of employee compensation. (See generally, *Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 198 [28 Cal.Rptr.2d 388].)

PERS determines employer contribution rates based on compensation figures and actuarial assumptions. PERS periodically adjusts employers' rates of contribution to compensate for any inaccuracy in those assumptions. Employee contribution rates, in contrast, are fixed by statute.

A. *Facts*

Appellants were members of PERS pursuant to a 1945 agreement between PERS and the City. (See Gov. Code, § 20460, formerly § 20450.)[1] In September 1989, at the suggestion of one or more appellants, the City passed Resolution No. R-118-89. The resolution noted that because retirement

---

[1]Further statutory references are to this code. The PERL provisions involved in this appeal were amended and renumbered after the relevant events occurred. Unless otherwise stated, we refer to the provisions in effect when appellants retired.

income for City employees was "based totally on salary, with no credit included for benefits," employees often would "delay their retirement past the appropriate point in time in order to increase the salary amounts used in the calculation of retirement income." Accordingly, the resolution authorized the city manager "to convert premiums paid by the City for specified benefits to salary, in instances where employees are eligible, and agree, to retire within a twelve month period." The benefits eligible for conversion were PERS retirement contributions, health, dental, life and long-term disability insurance premiums, deferred compensation, and automobile allowances.

Appellants Dewayne Hudson, Ronald E. Gemmell and Paul J. Connolly submitted their resignations in December 1989, effective December 31, 1990. Appellant Herbert C. Conaway submitted his resignation in July 1990, effective July 13, 1991. Each appellant stated in writing his desire to convert to salary for his final year of employment all benefits that could be converted under Resolution No. R-118-89. Subsequently, each appellant's benefits were reduced, and his salary was increased by a corresponding amount.[2] As a result of the conversions, Hudson's monthly salary, as reported by the City to PERS, went from $3,915 to $6,311, Gemmell's from $5,090 to $8,000, Connolly's from $5,193 to $7,960, and Conaway's from $4,810 to $6,078.

Each appellant then retired on the effective date of his resignation, Hudson at age 54, Gemmell at 56, and Connolly at 55. The record does not reflect Conaway's age at retirement.

In November 1990, the City requested that PERS update the final compensation figures for Hudson, Gemmell and Connolly, to include the converted benefits. In June 1991, after reviewing Resolution No. R-118-89, PERS advised the City that only a portion of the increased salaries resulting from the converted benefits could be included in calculating appellants' pensions.[3]

In August 1991, the City rescinded Resolution No. R-118-89. The rescinding resolution stated PERS had "notified the City of its intent not to allow for conversion of benefits in its calculation of retirement allowances for former Colton employees."

---

[2] The record does not reflect exactly what benefits each appellant gave up. Apparently, the benefits included insurance premiums, employer-paid retirement contributions, and, in some cases, a City car.

[3] PERS agreed to include in compensation increases attributable to the conversion of employer-paid PERS member contributions.

## B. *Procedural Background*

Appellants commenced an administrative appeal of PERS's determination and the matter was heard before an administrative law judge (ALJ). The ALJ issued a proposed decision denying relief, which PERS later adopted. Appellants petitioned for a writ of administrative mandamus requiring PERS to include the converted benefits in calculating their pension benefits. In the alternative, appellants sought a writ of mandate requiring the City to pay amounts equal to the additional pension amounts they would have received had PERS included the converted benefits. For reasons discussed, *post*, the lower court entered judgments for PERS and the City.

## II

## DISCUSSION

## A. *Liability of PERS*

### 1. *Relevant Code Provisions*

When appellants retired, "compensation" for purposes of calculating retirement benefits was defined in former section 20022. Subdivision (a)(1) of that section defined compensation generally to include "remuneration paid in cash" plus the monetary value of any "other advantages of any nature furnished a member by his or her employer in payment for his or her services . . . ."

Subdivision (b) enumerated specific items which were not to be considered compensation. These included "the provision by an employer of any medical or hospital service or care plan or insurance plan . . . for its employees, any contribution by an employer to meet the premium or charge for such plan, or any payment into a private fund to provide health and welfare benefits for its employees." (Former § 20022, subd. (b)(1).) Also excluded from compensation was "special compensation for additional services outside regular duties, such as . . . allowance for automobile . . . ." (*Id.*, subd. (b)(10).) Finally, section 20022 excluded from compensation "final settlement pay," which was defined to mean "any pay in excess of salary granted or awarded in connection with a separation from employment, including severance pay, bonuses, retroactive adjustments to salary, payment of the value of retroactive adjustment to benefits, and any other grant or award that the [PERS] board may determine is 'final settlement pay.' " (Former § 20022, subd. (b)(8).)

The lower court concluded the converted insurance benefits could be excluded under section 20022, subdivision (b)(1), and the car allowances

under subdivision (b)(10). However, the court ruled that all the disallowed amounts were excluded under subdivision (b)(8) as final settlement pay. Because we agree with the lower court that the payments at issue were excludable as final settlement pay, we do not address whether certain payments also were excludable under the other provisions cited by the court.

### 2. Statutory Interpretation

■ "[O]ur primary task in construing a statute is to determine the Legislature's intent." (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) When, on the other hand, a statute is ambiguous, "we typically consider evidence of the Legislature's intent beyond the words of the statute . . . ." (*Watts* v. *Crawford* (1995) 10 Cal.4th 743, 751 [42 Cal.Rptr.2d 81, 896 P.2d 807].) And, in fact, even where the language is clear, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . ." (*Lungren* v. *Deukmejian, supra*, 45 Cal.3d at p. 735.) "The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Ibid.*; *Provigo Corp.* v. *Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [28 Cal.Rptr.2d 638, 869 P.2d 1163].)

■ Applying these principles, we conclude the lower court correctly determined the Legislature intended that conversions of the type at issue here be excluded from compensation as final settlement pay. We find that intent reflected in the various exclusionary provisions of former section 20022 as they existed when appellants retired, and in the Legislature's subsequent amendment of PERL in 1993 explicitly to exclude from compensation, as final settlement pay, converted benefits granted in connection with retirement.

### a. Exclusionary Provisions of Former Section 20022

As already noted, when appellants retired, former section 20022, subdivision (b)(8), defined final settlement pay generally to include "any pay in excess of salary granted or awarded in connection with a separation from employment." Appellants do not appear to dispute that the converted amounts were "granted or awarded in connection with a separation from employment," but argue that because the benefits were converted to salary,

the additional amounts paid could not be "in excess of salary" as required for final settlement pay.[4] We therefore first consider whether, under the provisions in existence when appellants retired, the converted amounts properly could be characterized as salary.

As noted, *ante*, when appellants retired former section 20022, subdivision (b)(1) excluded from compensation amounts paid by an employer for health care and insurance, and subdivision (b)(10) excluded car allowances. In addition, section 20022, subdivision (b)(14) excluded "payments made by employers to or on behalf of their employees who have elected to be covered by a flexible benefits program, where those payments reflect amounts that exceed their employees' salaries." Flexible benefits programs typically provide for additional remuneration to employees that can either be received in cash or used to pay for benefits such as health, dental, life, or disability insurance. (See, e.g., *Howard Jarvis Taxpayers' Assn.* v. *Board of Supervisors* (1996) 41 Cal.App.4th 1363, 1367 [49 Cal.Rptr.2d 157].)[5]

Read together, these provisions evidence a general intent to distinguish between "salary" on the one hand, and remuneration consisting of other benefits, on the other hand, whether those other benefits are provided in kind (as in the case of insurance coverage) or as a cash stipend (as in the case of car allowances and flexible benefits programs). It is apparent that the parties in this case contemplated the funds converted to "salary" would continue to be used to provide nonsalary benefits. The agenda report recommending adoption of Resolution No. R-118-89 stated: "The total compensation amount authorized by the Council for individual employees would not be exceeded; current premiums would simply be *shown as salary and then deducted after taxes from that salary.*" (Italics added.) The obvious implication was that the funds would be "deducted" from salary so that they could be used to pay for the same benefits appellants had received prior to the conversions.

Appellants argue that once the amounts in question were converted to salary, their original purpose was irrelevant. The fact the increased amounts

---

[4] Appellants also assert PERS waived any claim the converted benefits were final settlement pay by not invoking that provision until it filed its statement of issues in connection with the administrative appeal. Where, as here, the facts are undisputed, the proper application of a statutory provision is a question of law and may be raised at any time, particularly in cases involving important issues of public policy like this one. (*Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412, 417 [194 Cal.Rptr. 357, 668 P.2d 664].) In any event, appellants had ample opportunity to litigate the issue both in the administrative appeal and in the mandamus proceeding in the lower court.

[5] Flexible benefits programs typically are designed to avoid taxation of the additional remuneration. (See *Howard Jarvis Taxpayers' Assn.* v. *Board of Supervisors, supra,* 41 Cal.App.4th 1363.) Here, however, appellants paid tax on the converted benefits.

were nominally characterized as salary should not, in our view, end the inquiry. Otherwise, many, if not all, of the exclusions in former section 20022 could be avoided at will, merely by recharacterizing amounts attributable to the excluded items as "salary." Indeed, former section 20022 itself makes clear that the fact an amount may be denominated salary does not mean it cannot be "in excess of salary" for purposes of determining whether it is final settlement pay; the definition of final settlement pay expressly includes "retroactive adjustments to salary."

Appellants further argue that under the principle of *ejusdem generis*, "final settlement pay" should be limited to the types of items specifically mentioned in the statutory definition, i.e., "severance pay, bonuses, retroactive adjustments to salary, [and] payment of the value of retroactive adjustment to benefits . . . ." They assert that, unlike the mere conversion of funds from one form of compensation (benefits) to another (salary), the items enumerated in the statute all involve payment of additional funds beyond the amount originally promised. ■ Appellants overlook the fact that *ejusdem generis* " ' "is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage." ' " (*Moore* v. *Conliffe* (1994) 7 Cal.4th 634, 671 [29 Cal.Rptr.2d 152, 871 P.2d 204].) ■ Here, however, that presumption is unwarranted. The Legislature in defining final settlement pay in former section 20022 expressly included "any other grant or award that the [PERS] board may determine is 'final settlement pay.' " Thus, the specific items mentioned manifestly were not intended to limit the scope of the definition.

Moreover, as the Supreme Court has noted, *ejusdem generis* does not apply where its application would frustrate the intent underlying the statute. (*Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].) The exclusion of final settlement pay from compensation was intended to eliminate distortions caused by extraordinary increases just prior to retirement. The conversions involved here reflected just such an arrangement. It would frustrate the intent of the statute to exclude such an arrangement from the definition of final settlement pay merely because it is not specifically mentioned in the definition.[6]

---

[6]Appellants vigorously deny that their benefit conversions effected any artificial inflation of retirement benefits, asserting they were simply designed to afford appellants "approximately the same benefit as would be the case were they to retire when they originally planned." But Resolution No. R-118-89 did not in any way limit the benefits which could be converted to those necessary to provide an equivalent pension, and, in fact, no evidence was presented to show what pensions appellants would have received had they not retired early. And even if

### b. *Subsequent Amendment of PERL*

In 1993, the Legislature amended former section 20022, substantially shortening the statute and deleting the exclusions set forth in subdivision (b). (Stats. 1993, ch. 1297.) Instead, section 20022, as amended, provided that "[c]ompensation shall be reported in accordance with Section 20023 and shall not exceed compensation earnable, as defined in Section 20023."

Former section 20023, in turn, was amended to exclude from compensation earnable "[f]inal settlement pay." (Former § 20023, subd. (c)(7)(A).) Final settlement pay was defined to mean: "any pay *or cash conversions of employee benefits* that are in excess of compensation earnable, that are granted or awarded to a member in connection with or in anticipation of a separation from employment." (Former § 20023, subd. (f), italics added.) Thus, as appellants recognize, PERL as amended in 1993 expressly excluded the converted benefits in this case from compensation.

Appellants naturally view the amendments as proof that final settlement pay under PERL, prior to the amendments, did not include converted benefits; otherwise, the amendments would have been unnecessary. ▮ However, "[w]e assume the Legislature amends a statute for a purpose, but that purpose need not necessarily be to change the law. [Citation.] Our consideration of the surrounding circumstances can indicate that the Legislature made material changes in statutory language in an effort only to clarify a statute's true meaning." (*Western Security Bank* v. *Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507].) "One such circumstance is when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation: ' "An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute. . . ." ' " (*Ibid.*)

▮ The circumstances surrounding the 1993 amendments convince us the inclusion of converted benefits in final settlement pay was intended to be a clarification of, not a change in, the prior definition. Recognizing that the requirement in former section 20022 that final settlement pay be "in excess of salary" might be used by agencies and their employees to avoid the exclusion of final settlement pay from compensation simply by agreeing to recharacterize final year benefits as "salary," the Legislature moved to make

---

the record showed appellants received only what they would have received had they retired later, they overlook the advantage they obtained in not having to work the additional years to secure that income.

it clear it did not intend such a result. And it appears the Legislature did so reasonably promptly after PERS brought to its attention the problems caused by final year benefit conversions.

■ When the meaning of a statute is disputed, we may consider legislative history, including the reports of legislative committees during the legislative process. (*DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 393 [20 Cal.Rptr.2d 523, 853 P.2d 978].) ■ We have obtained from state archives legislative materials concerning the 1993 amendments to former sections 20022 and 20023. (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 448 [24 Cal.Rptr.2d 751, 862 P.2d 751].)[7] Those materials reveal that, no later than April 1992, PERS formally took the position that final year conversions of benefits to salary were not to be reported as compensation for retirement purposes. In Circular Letter No. 310-369, dated April 10, 1992, PERS stated it recently had become aware that contracting agencies had been "entering into labor agreements with individuals and groups, that provide inflated pension benefits for employees whose retirements are imminent," citing as the most prevalent example agreements "to increase the compensation reported to PERS in the final year(s) before retirement." (Circular Letter No. 310-369, p. 1.)

Circular Letter No. 310-369 further stated: "The items of compensation that appear to be erroneously reported the most frequently are: [¶] • **payments resulting from the conversion of a benefit to salary**. For example, if an employer provides medical insurance and contributes in part or in whole for the premium, such premium cannot be reported as compensation for the member. *If a member elects not to have the benefit, then any additional compensation that may result cannot be reported as compensation to PERS.*" (Circular Letter No. 310-369, p. 2, italics added.)

Ultimately, PERS sponsored the 1993 legislation, introduced as Senate Bill No. 53, which added benefits conversions to the definition of final settlement pay. A March 1993 report of the Senate Public Employment and Retirement Committee on the bill stated: "A series of audits have shown widespread 'spiking' (purposeful inflation) of the final 'compensation' (upon which retirement benefits are based) [of] local contracting agency employees is a major problem in the Public Employees' Retirement System." (Sen. Pub. Employment and Retirement Com. Rep. on Sen. Bill No. 53 (1993-1994 Reg. Sess.) p. 1.) The report noted the bill would "provide[] a clear definition of compensation" and "reduce[] the ability to manipulate 'compensation,' thereby increasing benefits." (*Id.*, at p. 2.) Nowhere in the report, or in any other portion of the legislative material, is there any

---

[7]We provided copies of the materials cited in this opinion to the parties prior to oral argument.

indication that the definition of final settlement pay to include converted benefits was considered to be a change in the existing law. The Supreme Court, in fact, recently observed that although the Legislative Counsel's Digest of Senate Bill No. 53 noted that the bill recast and redefined "compensation" and "compensation earnable," it did not indicate any change in the treatment of specific items from their treatment under the preexisting legislation. (*Ventura County Deputy Sheriffs' Assn.* v. *Board of Retirement* (1997) 16 Cal.4th 483, 504-505 [66 Cal.Rptr.2d 304, 940 P.2d 891].)[8]

For these reasons, we conclude former section 20022 as it existed when appellants retired should be interpreted to exclude from compensation the type of final year conversions involved in this case. The converted amounts amply satisfied the definition of final settlement pay, even prior to the amendment, because they were remuneration in excess of regular salary, given in connection with retirement. The amendment clarified, but did not change, the definition's applicability to conversions of benefits. We need not, and do not, decide whether receipt of money in lieu of benefits must be excluded from compensation in all instances.[9] Rather, we limit our holding to the case before us, in which it is not disputed that the final year conversions (1) involved benefits which clearly would not have been considered salary prior to the conversions and (2) were made for the express purpose of enhancing appellants' retirement benefits.

We next address two additional principles of statutory construction which, though relevant to our discussion, do not change our conclusion.

###### c. *Construction in Favor of Pensioners*

 We acknowledge the principle, recently applied by the Supreme Court, that "[a]ny ambiguity or uncertainty in the meaning of pension legislation must be resolved in favor of the pensioner . . . ." (*Ventura County Deputy Sheriffs' Assn.* v. *Board of Retirement, supra,* 16 Cal.4th 483,

---

[8]At oral argument appellants suggested the fact that certain proponents of the 1993 legislation characterized the existing law as "flawed" demonstrates that the existing law did not, in fact, preclude arrangements of the type at issue here, and that the 1993 legislation was necessary to correct that flaw. However, we view the proponents' statements as a recognition that the existing law, as written, failed to make it clear that converted benefits were intended to be excluded from compensation. The fact the law was "flawed" in that sense is in no way inconsistent with our conclusion that the amendment of the law in 1993, to address that point explicitly, accomplished a clarification rather than a substantive change.

[9]Appellants posit the hypothetical of an employee who elects at the outset of a 30-year career to receive a higher salary by foregoing benefits, in the expectation of eventually getting a higher pension. The hypothetical employee's retirement benefits, however, would reflect salary actually paid to him over the years, not a temporary "conversion" of nonsalary items to salary in the final year as occurred here.

490.) It could be argued that, by failing to state expressly whether converted benefits were to be considered compensation, former section 20022 was uncertain and therefore should be construed in favor of appellants. A corollary to the rule of construction in favor of the pensioner, however, is that "such construction must be consistent with the clear language and purpose of the statute." (16 Cal.4th at p. 490.) Thus, "this rule of liberal construction is applied for the purpose of effectuating the *obvious legislative intent* and should not blindly be followed so as to eradicate the clear language and purpose of the statute and allow eligibility for those for whom it was obviously not intended." (*Barrett* v. *Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593, 1608-1609 [234 Cal.Rptr. 900].)

As we have previously concluded, the Legislature did not intend to permit PERS members to obtain enhanced retirement benefits by recharacterizing as salary final year fringe benefits that normally would be excluded from compensation. We therefore construe the statute to exclude the converted benefits from compensation notwithstanding the rule of liberal construction.

### d. *Administrative Interpretation*

■ Appellants presented evidence that PERS, at various times before appellants retired, permitted employees of other cities to exercise salary conversions similar or identical to those at issue here. The City of Huntington Beach, for example, allowed management employees to convert final year vacation credits and vehicle allowances to salary. Similarly, the City of Salinas allowed department heads the option of increasing their final year salaries by converting health insurance, car allowance, and other benefits. In correspondence in 1987 and 1989, PERS advised the cities that PERL did not preclude the arrangements, and that the increased salary amounts should be reported as compensation. PERS took the same position in 1989 correspondence to Assemblyman Dave Elder, who later introduced 1992 pension reform legislation (Assem. Bill No. 2331) which was vetoed. In its correspondence to both Salinas and Assemblyman Elder, PERS cautioned that "[f]rom a policy standpoint," it was "opposed to any arrangement which inflates final compensation over and above what normally would be expected."[10]

In November 1989, PERS issued Circular Letter No. 800-198. The letter stated PERS had become aware that a number of employers had agreed to

---

[10]In 1987 correspondence, PERS approved an arrangement under which the city manager of the City of Anaheim was allowed to convert to salary sums paid for his automobile reimbursement, health and life insurance, and other benefits. However, it does not appear these conversions occurred in the final year of employment.

allow employees "to convert accumulated sick leave, vacation and CTO to salary," in order to "increase an employee's final compensation to be used in the calculation of retirement benefits."[11] Again, PERS stated that PERL did not preclude converting such benefits, but advised it was opposed to any arrangement which would inflate final compensation above normal levels.

Appellants do not claim they relied on these statements of PERS in deciding to retire early and exercise their conversion options.[12] However, they invoke the principle that " 'the contemporaneous administrative construction of [an] enactment by those charged with its enforcement . . . is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.' " (*People* ex rel. *Lungren* v. *Superior Court* (1996) 14 Cal.4th 294, 309 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) But that principle is qualified by a recognition that "an administrative agency may change its interpretation of a statute, rejecting an old construction and adopting a new." (*Henning* v. *Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1269 [252 Cal.Rptr. 278, 762 P.2d 442].) Further, "[e]ven when an agency adopts a new interpretation of a statute and rejects an old, a court must continue to apply a deferential standard of review." (*Id.*, at p. 1270.)

As discussed in part II.A.2.b., *ante*, in Circular Letter No. 310-369, dated April 10, 1992, PERS plainly took the position that payments received on account of conversions of such items as medical insurance could not be reported as compensation. (Circular Letter No. 310-369, p. 2.) Earlier, in fact, in Circular Letter No. 100-043, dated July 27, 1984, PERS had taken the position that payments under "cafeteria" style benefit plans, under which employees received an allowance which could be used to select various benefits, or a cash payment for any unused amount, were " 'not to be considered compensation for retirement purposes.' "

In view of PERS's differing positions, and given the fact its most recent position was contrary to that of appellants, we decline to apply the policy of deference in appellants' favor. We also note the record does not show whether the benefit conversions which PERS approved in the Huntington Beach and Salinas cases were conditioned on early retirement, as were the

---

[11]"CTO" presumably referred to compensatory time off. (See *City of Sacramento* v. *Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1491, fn. 15 [280 Cal.Rptr. 847].)

[12]Hudson testified he became aware of Circular Letter No. 800-198, but not until after he decided to retire and exercised his conversion option. He did not discuss with PERS or the City whether the letter applied to his situation. Similarly, although the City agenda report recommending Resolution No. R-118-89 be rescinded stated the resolution had been adopted after discussion with the local PERS office, no evidence was presented to show PERS ever told the City or appellants that the conversions in this case were permissible.

conversions here. Additionally, it does not appear that either in those cases, or in the correspondence to Assemblyman Elder or Circular Letter No. 800-198, PERS considered the issue of final settlement pay. PERS's reliance on that basis for exclusion here therefore may reflect inadvertence in the other cases rather than inconsistent positions.

In any event, even if PERS had consistently agreed with appellants, we would reject that interpretation as contrary to the intent of the Legislature, for the reasons discussed previously. "[A]dministrative construction of a statute, while entitled to weight, cannot prevail when a contrary legislative purpose is apparent." (*Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 117 [172 Cal.Rptr. 194, 624 P.2d 244].)

### 3. December 1992 Short-term Policy

■ In December 1992, PERS issued Circular Letter No. 310-171, announcing its adoption of a short-term policy covering the period from December 18, 1992, to June 30, 1994. The policy stated that conversions of employer-paid PERS member contributions, unearned vacation credit, sick leave credit, and "other leave" credit would be included in compensation for retirement purposes if they were provided for in "a labor agreement or legislative actions" on December 18, 1992. The policy further provided that, for the same period, PERS "may use the basic principles of estoppel to approve other types of compensation provided to members through written labor agreements, except that individual detriment need not be proven if such agreements or provisions are the result of a misunderstanding of fact or based on written communication from [PERS] which includes PERS Circular Letters. If it was based only on a misunderstanding of fact, an agency will be required to demonstrate that the compensation was for an *entire group* or class of employment and has been funded over the entire period the compensation has been provided."

Appellants assert PERS failed to show why the policy should not be applied to the conversions in this case, but several reasons are apparent. First, the policy was not effective until well after the conversions and the disputed salary increases occurred, and appellants retired. Second, the policy required that an agreement authorizing the conversions be in place at the time the policy was adopted. But, as discussed earlier, by that time the City had rescinded Resolution No. R-118-89. Third, the conversions in this case did not concern employer-paid member contributions, unearned vacation or sick leave credit, or "other leave," so appellants would have had to rely on estoppel. They could not do so, because PERS engaged in no misleading conduct on which appellants could have relied. (In fact, as discussed in part

II.A.5., *post*, appellants do not assert estoppel based on conduct of PERS itself, but only indirectly based on conduct of the City.) Finally, appellants could not show the conversions had been funded over the entire period they were provided. In fact, according to PERS, if the conversions were included in computing pension amounts, substantial unfunded liabilities would result.[13]

### 4. *Equal Protection*

 Appellants contend PERS's disallowance of the benefit conversions violated equal protection, because (as discussed, *ante*), PERS allowed similar programs in other cities. They contend the only intervening event was PERS's subsequent change in its interpretation of PERL, an insufficient basis for disparate treatment.

An administrative agency's changed interpretation of a statute is not a basis for an equal protection challenge. (*Sam* v. *United States* (1982) 682 F.2d 925, 934 [230 Ct.Cl. 596].) A different rule would "effectively inhibit any legislative or other governmental body from amending its statutes or regulations," producing absurd results. (*Id.*, at p. 935.) "[T]here is no equal protection right to an incorrect interpretation of the law by a state agency." (*Grenemyer* v. *Gunter* (D.Colo. 1991) 770 F.Supp. 1432, 1438.)

Appellants also contend PERS's December 1992 short-term policy impermissibly discriminated by permitting conversions of employer-paid member contributions and unearned sick leave and vacation, but not other benefits. As we have seen, the policy would not have covered the conversions in this case in any event. Moreover, "[a] writ of mandate is not a writ of right to be freely issued whenever a court disagrees with the policy of administrative action. . . . When a statute imposes upon an administrative body discretion to act under certain circumstances, mandate will not lie to compel the exercise of such discretion in a particular manner." (*Barrett* v. *Stanislaus County Employees Retirement Assn.*, *supra*, 189 Cal.App.3d 1593, 1613.)

 PERS was granted discretion under former section 20022 to determine what should be considered compensation for retirement purposes. (Former § 20022, subd. (a)(12), (b)(15).) In November 1992, PERS noted that many existing labor agreements permitted conversions of member contributions, unearned sick leave, and unearned vacation, despite PERS's

---

[13]According to PERS, its expected unfunded liabilities if the converted benefits were included in computing pension amounts would be $191,069.46 for appellant Connolly, $221,801 for appellant Gemmell, $181,319.92 for appellant Hudson, and $84,800 for appellant Conaway.

belief they were improper. (Mem. from Sandra C. Lund, PERS Asst. Exec. Officer, to Dale M. Hanson, PERS Chief Executive Officer (Nov. 12, 1992) p. 1.) Similarly, the PERS representative who testified at the administrative appeal noted that during the 1980's many agencies began paying their employees' member contributions instead of providing cost-of-living increases, without realizing the negative effect on the employees' pension benefits.

In the 1993 amendments to PERL (Stats. 1993, ch. 1297, § 17), the Legislature expressly authorized conversion of employer-paid member contributions during employees' final compensation periods, provided prior notice was given to PERS and the public, and the additional employer contributions were funded on an actuarial basis. (Former § 20615.5, subds. (a), (c), (e), (f).) A March 1993 analysis of the legislation noted that labor agreements frequently allowed such conversions and that both employers and employees believed the practice should be continued.

 " 'In cases where a classification burdens neither a suspect group nor a fundamental interest, "courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws," ' " and only a rational basis must be shown to uphold the classification. (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 43 [2 Cal.Rptr.2d 376, 820 P.2d 600].) Appellants do not identify any suspect classification or fundamental interest implicated in PERS's short-term policy. Courts generally have applied a rational basis test in evaluating equal protection claims based on differing treatment of members of public employee retirement plans. (See, e.g., *Ritchie v. Workers' Comp. Appeals Bd.* (1994) 24 Cal.App.4th 1174, 1191 [29 Cal.Rptr.2d 722] [differing treatment of municipal police officer PERS members and California Highway Patrol members]; cf. *Davis v. City of Sacramento* (1982) 138 Cal.App.3d 356, 360 [188 Cal.Rptr. 607] [differing pension rights of police officers under city charter].) We conclude that test should apply here.

The record indicates PERS's decision to permit conversion of certain benefits was based on a determination that historical practice warranted special treatment, a view that the Legislature shared. We cannot say PERS's failure to reach the same conclusion with respect to the conversion of other benefits was an abuse of its statutory discretion or a violation of equal protection. In addition, appellants overlook the fact that PERS disallowed the salary increases here not only because they were attributable to conversion of benefits, but also because they were given in return for retirement within 12 months, thus bringing them within the definition of final settlement pay. There was no indication in the short-term policy that it would

override the application of former section 20022, subdivision (b)(8) to permit conversions of employer-paid member contributions and unearned sick leave and vacation even if they were conditioned on early retirement. Thus, PERS had an additional rational basis for distinguishing appellants' case from those covered by the policy.

### 5. *Estoppel*

Appellants' final argument in favor of liability against PERS is that PERS should be estopped from excluding the converted benefits from compensation. They do not claim to have relied on any conduct of PERS itself, but contend they relied on conduct of the City which operated to estop PERS because it was in privity with the City.

"The acts of one public agency will bind another public agency only when there is privity, or an identity of interests between the agencies." (*Lusardi Construction Co.* v. *Aubry* (1992) 1 Cal.4th 976, 995 [4 Cal.Rptr.2d 837, 824 P.2d 643].) Privity requires that the party to be estopped be " 'so identified in interest with another that he represents the same legal right.' " (*Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382, 398 [29 Cal.Rptr. 657, 380 P.2d 97].) Where two public agencies' interests conflict, there is no privity. (*Lusardi Construction Co., supra,* 1 Cal.4th at p. 995.)

We find no basis for privity in this case. The City's agenda report for Resolution No. R-118-89 shows its objective was to save money by inducing employees to retire early. To attain that objective, it was willing to pay employees salaries they would not have merited until later, if at all, for the express purpose of securing for them higher pension benefits than they otherwise would have received. PERS, on the other hand, opposed such arrangements as a matter of policy, as it repeatedly stressed even before it took the position they were not authorized by PERL. Its interest was in ensuring that pension benefits, and the contribution levels on which they were based, accurately reflected actual compensation over the beneficiary's years of employment.

PERS makes actuarial assumptions based on historical compensation figures. Based on those assumptions, it establishes rates for member contributions to be paid by employees, and by employers on their behalf. The assumptions incorporate an estimate of how much an employee's compensation will increase each year. If the employee's compensation increases at a greater rate, a potential for underfunding is created.

Appellants assert that "[i]f PERS determines that additional funding is required, it simply calls upon the employer to supply those sums through

increased contribution rates." They overlook the fact that contribution rates for local agencies are determined on an annual basis, effective on July 1 following notice of a change in rate. (§ 20814, subd. (b), formerly §§ 20750.9, 20750.905.) Thus, increased contribution rates resulting from appellants' extraordinary final year salary increases would affect the City's contribution rates for future employees, not for appellants. Increased contribution rates, presumably, would decrease the amounts available for salary to those future employees, thus decreasing their retirement benefits in order to fund higher benefits for appellants.

Similarly, where an employee has worked for more than one employer which participates in PERS, any underfunding could increase the contribution rate not only of the most recent employer, but also of any previous employer. And if an employer terminates its participation in PERS before an unfunded liability is paid, all of its employees' benefits are reduced accordingly. (*Carman* v. *Alvord* (1982) 31 Cal.3d 318, 325 [182 Cal.Rptr. 506, 644 P.2d 192]; see §§ 20570, 20577.)

In each case, the rights of employees who did not receive the compensation increases that caused the underfunding would be adversely affected. That is not how the PERS system is supposed to work. The legislative committee which originally recommended the establishment of the system "stressed the need to place a retirement system on a 'sound financial basis, where liabilities are provided for as they are *incurred*, rather than when they mature.' " (*Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 780 [189 Cal.Rptr. 212], disagreed with on another point in *Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1101, fn. 23 [240 Cal.Rptr. 569, 742 P.2d 1290], quoting Rep. of the Com. on Pensions of State Employees (1929) p. 9.)

"[E]stoppel will not be applied against the government if to do so would nullify a strong rule of policy adopted for the benefit of the public." (*Lusardi Construction Co.* v. *Aubry, supra,* 1 Cal.4th 976, 994-995.) PERS's desire to maintain the actuarial soundness of the system it administered reflected not only its own interest but also a recognized public policy. " '[T]he Legislature intended to create and maintain the PERS on a sound actuarial basis . . . .' " (*Board of Administration* v. *Wilson* (1997) 52 Cal.App.4th 1109, 1133 [61 Cal.Rptr.2d 207].)

Additionally, public policy disfavors permitting a contracting employer, such as the City, to determine what elements of its compensation package should be considered compensation for retirement purposes. "[P]ublic agencies are not free to define their employee contributions as compensation or not compensation under PERL—the Legislature makes those determinations." (*Oden* v. *Board of Administration, supra,* 23 Cal.App.4th 194, 201.)

Allowing conduct of the City to estop PERS would, in effect, permit the City to usurp PERS's statutory authority to determine compensation for retirement purposes. "To find an estoppel by privity in this context could have the pernicious effect of inducing subordinate governmental entities to disregard the rule of law." (*California Tahoe Regional Planning Agency* v. *Day & Night Electric, Inc.* (1985) 163 Cal.App.3d 898, 905 [210 Cal.Rptr. 48].)

B. *Liability of the City**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### DISPOSITION

The judgments in favor of PERS and the City are affirmed. The parties shall bear their own costs on appeal.

Hollenhorst, Acting P. J., and Gaut, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 11, 1998. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1310.