Filed 3/20/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

MATTHEW C. MCGLYNN et al.,

     Plaintiffs and Appellants,

v.

STATE OF CALIFORNIA et al.,

     Defendants and Respondents.

A146855

(San Francisco City & County
 Super. Ct. No. CPF-14-514052)

**INTRODUCTION**

In this mandamus proceeding, six judges who were elected to the superior court in mid-term elections in 2012, but who did not take office until January 7, 2013, maintain they are entitled to benefits under the Judges' Retirement System II (JRS II)[1] as in effect at the time they were elected, rather than at the time they assumed office. This is a matter of considerable importance to these judges because, on January 1, 2013, JRS II became subject to the provisions of the California Public Employees' Pension Reform Act of 2013 (PEPRA),[2] which amended virtually all state employee retirement systems to begin addressing the state's enormous unfunded pension liability and returning these systems to actuarially sound footing. Among other things, PEPRA increases employee contributions, provides for fluctuating contribution rates based on market performance and actuarial projections, and bases the amount of monthly pension payments on an employee's final three years of compensation, rather than on only the final year.

We conclude, as did the trial court, that the judges did not obtain a vested right in JRS II benefits as judges-elect, but rather obtained a vested right to retirement benefits

---

[1] Government Code section 75500 et seq.

[2] Government Code section 7522 et seq.

1

only upon taking office, after PEPRA went into effect. We also conclude PEPRA's provisions pertaining to fluctuating pension contributions do not violate the non-diminution clause of the California Constitution (Cal. Const., art. III, § 4), nor do they impermissibly delegate legislative authority over judicial compensation (Cal. Const., art. VI, § 19). We therefore affirm the judgment.[3]

## BACKGROUND

The petitioning judges were elected to superior court judgeships in June and July of 2012. However, the terms of their offices did not commence, and they did not begin to draw a state salary, until January 7, 2013. (Cal. Const., art. VI, § 16, subd. (c) ["Terms of judges of superior courts are six years beginning the Monday after January 1 following their election."].) Other judges were appointed to office during 2012. Unlike appellants, they assumed office on or before December 31, 2012, and the parties do not dispute that their retirement benefits are governed by pre-PEPRA JRS II.[4] There is an additional, third group of judges—those who were elected during 2012, but who held public

---

[3] Our Supreme Court has granted review in two recent cases addressing the impact of PEPRA on other public employee retirement systems, *Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn.* (2016) 2 Cal.App.5th 674, review granted November 22, 2016, S237460, and *Cal Fire Local 288 v. California Public Employees' Retirement System* (2016) 7 Cal.App.5th 115, review granted April 12, 2017, S239958. Both cases provide an excellent overview of the financial crisis facing public pension systems, and both address whether government employees have vested rights in the way in which pension benefits were previously calculated. Both cases conclude they do not. (*Marin Assn.*, at p. 680; *Cal Fire*, at p. 121.) Neither case involved judges-elect, nor did they consider whether PEPRA's contribution requirements run afoul of the non-diminution clause applicable to judges.

[4] A judicial office is filled by election when the incumbent judge serves out his or her full term and does not seek reelection to another term. (See Cal. Const., art. VI, § 16, subds. (b), (c).) Because the judicial office remains filled by the incumbent until the end of the term, the individual who has been elected to next fill the office cannot actually assume it until the start of the new term. (*Id.*, subd. (c).)

A judicial office is filled by appointment when the incumbent judge retires before the end of his or her term. (Cal. Const., art. VI, § 16, subd. (c).) Because the office becomes vacant upon a retirement, the appointee can assume the office immediately. (*Ibid.*, see Gov. Code, § 75522, subd. (b).)

2

employment at the time and, thus, were already members of a public retirement system. Their retirement benefits are also governed by pre-PEPRA JRS II.

Between the time appellants were elected and the time they assumed their judicial offices, the Legislature passed, and the Governor signed into law, PEPRA, which became effective on January 1, 2013.

Appellants aver that prior to taking office, and in choosing to give up their private law practices and go into public service, they relied on representations by the state about JRS II. For example, after being elected but before assuming office, they were advised by state personnel about the provisions of pre-PEPRA JRS II—which include an 8 percent contribution rate and a monthly pension benefit based on the final year of salary—and were given a JRS II pamphlet. In fact, they allege state personnel expressly represented that "[u]pon PEPRA's passage and following its effective date," the pre-PEPRA provisions of JRS II would nevertheless continue to govern their retirement. And, for more than a year after they assumed office, until March 2014, the state treated the judges as within pre-PEPRA JRS II.

The state then did an about-face and notified appellants they were subject to PEPRA's less favorable provisions. As a result, the judges' take home pay in 2014 was reduced by 7.25 percent due to additional contributions to the retirement system (making their total contribution 15.25 percent of their salary) and was reduced by a further (unspecified) amount in 2015 due to an increased contribution rate. Appellants allege they "are now subject to a fluctuating and increasing–as opposed to [a] guaranteed–rate of contribution towards their pension benefits." The judges will also receive lower monthly pension payments, as under post-PEPRA JRS II, the amount will be based on the average of their final three years of compensation, rather than their final year.

The judges filed a verified petition for writ of mandate on behalf of themselves and those similarly situated to compel the State of California, the Judicial Council, the CalPERS Board of Administration, and the state's Comptroller (collectively respondents) to include them within pre-PEPRA JRS II. The judges additionally alleged respondents are subject to promissory and equitable estoppel.

3

The trial court sustained respondents' demurrer, deeming it dispositive that appellants' terms of office and their actual employment began on January 7, 2013. Their "statutory entitlement to pension benefits therefore began" after PEPRA was operative and not in 2012, when they were elected to, but had not yet been sworn into, their offices. "Accordingly," said the trial court, "PEPRA does not unconstitutionally impair their pension rights. Similarly, PEPRA does not violate the constitutional prohibition on lowering judicial salary during a judge's term of office. . . ." The court also rejected the judges' assertions that PEPRA unconstitutionally violates their right to equal protection and delegates to CalPERS the Legislature's authority to set judicial pay. The court concluded estoppel could not apply because the state respondents could not be compelled to act beyond their authority, which they would do if they treated appellants as within pre-PEPRA JRS II.

DISCUSSION

### Appellants are Subject to PEPRA

#### The Judicial Retirement System and PEPRA

In 1994, the Legislature made major changes to the then existing judicial retirement system, known as JRS I. (Cf. Gov. Code, §§ 75000 et seq., 75500 et seq.)[5] These changes included significant contribution increases, lower monthly retirement benefits, the elimination of the option to retire before 20 years of service with a correlative reduction in pension benefits, and the elimination of an economic incentive to defer retirement and work several additional years. (§§ 75521, 75522, 75601, 75602; see *Warner v. Public Employees' Retirement System* (2015) 239 Cal.App.4th 659, 667.) Accordingly, under this more recently enacted retirement system, known as JRS II, judges receive significantly reduced retirement benefits than were provided under JRS I. (*Id.* at p. 667.)

---

[5] All further statutory references are to the Government Code unless otherwise indicated.

4

JRS II expressly described the judges to which it applied as follows: " 'Judge' means a justice of the Supreme Court or of a court of appeal, or a judge of a superior court, municipal court, or justice court who is first elected or appointed to judicial office on or after November 9, 1994," which was the day following the 1994 general election. (§ 75502, subd. (a).) Accordingly, judges "elected or appointed" before November 9, 1994, were grandfathered into, and continued to receive, the more favorable benefits of JRS I. (§§ 75502, subd. (a), 75000, 75500.)

Under JRS II, the "period of time a judge receive[s] a salary and ma[kes] contributions to the system by reason of holding office as a judge" is known as the judge's "service." (§ 75502, subd. (c).) The state and counties, as applicable, deduct 8 percent from a judge's salary and deposit that amount in the JRS II retirement fund. (§§ 75601, 75602.) After attaining either 20 years of service and 65 years of age, or five years of service and 70 years of age, a "judge is eligible to retire" and receive a monthly pension payment based on the judge's salary during his or her final year in office and length of service. (§§ 75502, subd. (d), 75522, subd. (a).)

In 2012, nearly two decades after the enactment of JRS II, the California Legislature passed a comprehensive bill making significant changes to nearly all public retirement systems, including to JRS II. (§§ 7522 et seq., 75500 et seq.) Effective January 1, 2013, PEPRA affects public employees who are "new members" of their retirement systems. (§§ 7522.02, subd. (b), 7522.04, subd. (f)(1), 7522.30, 7522.32.) A new "member" includes "[a]n individual who becomes a member of any public retirement system for the first time on or after January 1, 2013, and who was not a member of any other public retirement system prior to that date." (§ 7522.04, subd. (f)(1).)

Among other things, under PEPRA, a new "member" must pay half of the "normal cost" of pension benefits (§§ 7522.30, subd. (a), 7522.04, subd. (g) [defining "[n]ormal cost"]), and the amount of a member's monthly pension benefit depends on his or her highest average pay over the final three years of employment (§ 7522.32).

5

*Under the Statutory Language, Appellants are Subject to PEPRA*

Appellants point out that they come within the parameters of JRS II—that is, they were "first elected or appointed to judicial office on or after November 9, 1994." (§ 75502, subd. (a).) They do, indeed. But that does not mean they are not affected by the amendments to JRS II made by PEPRA.

As set forth above, PEPRA took effect on January 1, 2013—six days before appellants assumed their judicial offices. By its own terms, the Act applies to any "[n]ew member," meaning an "individual who becomes a member of any public retirement system for the first time on or after January 1, 2013." (§ 7522.04, subd. (f)(1).) Accordingly, PEPRA applies to any judge who becomes a "member" of JRS II for the first time on or after January 1, 2013. (See § 75505, subd. (a) [expressly amending JRS II to require adherence to PEPRA to "the extent applicable"]; see also §§ 7522.02, subd. (a) & (b), 7522.04, subd. (f)(1), 7522.30, 7522.32.)

PEPRA, itself, does not address when a judge becomes a "member" of JRS II. However, JRS II and the Public Employees' Retirement Law (PERL), read together, provide the answer to this question.

The statutes establishing and governing JRS II instruct that the judicial retirement system "shall be administered and governed pursuant to [PERL] to the same extent and with the same effect as if those provisions are contained in this chapter [governing JRS II], except for those provisions that . . . conflict with any provision of this chapter." (§ 75505, subd. (a).) PERL, in turn, specifies that an "employee becomes a member" of his or her retirement system "upon his or her *entry into employment*." (§ 20281, italics added; see *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 499.) We discern no conflict in reading JRS II as including this provision of PERL. In fact, other provisions of JRS II are entirely consistent with PERL's directive that a public employee becomes a "member" of his or her retirement system upon "entry into employment." It is only upon assuming judicial office that a judge goes on the public payroll, is authorized to perform judicial duties, commences making contributions to the JRS II retirement system, and begins to accrue "monetary credits" towards a pension. (See Cal. Const. art.

6

XX, § 3 [must take oath of office before entering upon duties of office]; § 75502, subd. (f) [contributions made from salary]; § 75520 [monetary credits].)

Appellants could not, of course, be said to have entered into judicial employment as of the time they were elected. On the contrary, at least some of the appellants remained employed by their law firms to conduct an orderly disengagement from their practices and, perhaps, to ensure they received the full annual compensation they were promised. As long as they remained employed by their law firms, they could not also be employed as a judge, as judges are prohibited from engaging in such outside legal employment. (See Cal. Code Jud. Ethics, canon 4B, D.)

Appellants' reliance on section 75606 is misplaced. This statute prohibits judges *who are already bench officers*, and who are seeking a new term or a different judicial office, from withdrawing their pension contributions before the election or before transitioning to their new office, if elected. (§ 75606, subd. (a).) In other words, this statute applies to individuals who *are* judges and not merely judges-elect, and who have *already* paid into JRS II and have *already* accrued pension benefits.

There is, moreover, a striking difference between the statutory language that closed JRS I to future judges and established JRS II, on the one hand, and PEPRA's language modifying JRS II, on the other. As set forth above, the statutes closing JRS I and creating JRS II specifically defined judge to mean "a justice of the Supreme Court or of a court of appeal, or a judge of a superior court, municipal court, or justice court *who is first elected or appointed* to judicial office on or after November 9, 1994." (§ 75502, subd. (a), italics added.) While this language may be reasonably susceptible to the interpretation that judges who were merely *elected or appointed* before November 9, 1994, but who had not yet assumed their judicial offices, would become members of JRS I, rather than JRS II, no such language appears in PEPRA. Rather, PEPRA specifically applies to an individual who becomes "a member of any public retirement system for the first time on or after January 1, 2013, and who was not a member of any other public retirement system prior to that date." (§ 7522.04, subd. (f)(1).) An individual who is a judge-elect and not yet a judge, and who has never been a member of any public

7

retirement system, plainly falls within this statutory provision of PEPRA modifying JRS II.

In an effort to overcome this difference in the statutory language of JRS II as enacted, and as modified by PEPRA, appellants point out that, after the enactment of PEPRA, some members of the Legislature became concerned about its application to judges elected in 2012, but who could not, and did not, assume their offices until the commencement of new terms, on January 7, 2013. Accordingly, the 2013 cleanup legislation making numerous tweaks to PEPRA (Sen. Bill No. 13 (2013–2014 Reg. Sess.)) initially included language that "would have excluded from the definition of 'new member' as used in the provisions requiring new members to pay at least 50% of the normal cost rate, a judge who was elected to office prior to January 1, 2013, but may have become a member of the Judges' Retirement System II (JRS II) for the first time on or after that date." (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 13 (2013–2014 Reg. Sess.) as amended Sep. 12, 2013, p. 2.) However, this language was ultimately stricken from the bill before passage. (Stats. 2013, ch. 528, § 3; see § 7522.04, subd. (f).)

The following year, in 2014, the Legislature succeeded in passing legislation (Assem. Bill No. 837 (2013–2014 Reg. Sess.)) that would have "specifically exclude[d] from the definition of 'new member' a judge, as defined in specified existing law, elected to office before January 1, 2013." (*Ibid*.) An assembly report stated the bill's author believed the legislation merely corrected a " 'technical' " oversight, that PEPRA " 'was intended to apply to judges first elected or appointed after January 1, 2013,' " and that " '[i]t is clear under PEPRA that judges appointed before this date are included under the old pension contribution rules.' " (Assem. Conc. Sen. Amends. to Assem. Bill No. 837 (2013–2014 Reg. Sess.) as amended Aug. 4, 2014, p. 2.) The Governor, however, vetoed the legislation, stating: "This measure creates an exemption to the California Public Employees' Pension Reform Act of 2013. I am unwilling to begin chipping away at these reforms." (Governor's veto message to Assem. on Assem. Bill No. 837 (Sep. 28, 2014) Recess J. No. 25 (2013–2014 Reg. Sess.) p. 6805.)

Appellants claim these recent legislative efforts show that the intent of the Legislature when it passed PEPRA in 2012 was akin to its intent when it enacted JRS II in 1994 and grandfathered in both individuals elected to and holding judicial office prior to November 9, 1994. However, in our view, this subsequent legislative history underscores that, as written and enacted, PEPRA does not grandfather into pre-PEPRA JRS II individuals who, as of January 1, 2013, had only been elected to, but who had not yet assumed, judicial office and who had never been a member of any public pension plan. While some individual legislators may have been of the view that the language proposed in 2013 and 2014 would make only a "technical" change to PEPRA to clarify the Legislature's intent when it passed the Act in 2012, it is too much of a stretch to say that the unsuccessful legislative efforts in 2013 and 2014 reflect the collective legislative intent in 2012, particularly since the proposed language was removed from the 2013 cleanup legislation *while it was still in the Legislature* and the Governor understood the language proposed in 2014 as creating a new exception to the Act. (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922–923 [" 'court cannot accept the Legislative statement that an unmistakable change in the statute is nothing more than a clarification and restatement of its original terms' "].)

We therefore conclude that, under the relevant statutory provisions, appellants are subject to PEPRA.

### *No "Vested Right" to Pre-PEPRA JRS II Benefits*

Regardless of PEPRA's language, appellants claim that, having sought and won election to their judicial offices prior to the Act's effective date, they acquired a "vested right" in the retirement benefits provided under pre-PEPRA JRS II.

Appellants rely on language in cases to the effect that "the right to pension benefits vests upon the *acceptance* of employment." (*Miller v. State of California* (1977) 18 Cal.3d 808, 815 (*Miller*), italics added; accord *Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863 (*Betts*).) They maintain they "accepted" employment as a judge on being elected to the offices they sought.

9

However, neither *Miller* nor *Betts* involved an official-elect, and neither remotely suggests an individual who cannot yet legally assume the office for which they stand ready, acquires a "vested right" in any public benefit attached to that office. Indeed, neither case addressed the meaning of the term "acceptance" of employment.

In *Miller*, an employee of the state controller's office challenged a statute that changed the retirement age for employees in his category from 70 to 67 years old. (*Miller*, *supra*, 18 Cal.3d at p. 811.) The Supreme Court concluded the Legislature's power to reduce the tenure of an employee's civil service position, by changing the mandatory retirement age, was "not [] limited by any contractual obligation" (*id.* at p. 814); the employee had "no vested contractual right to remain in public employment beyond the age of retirement established by the Legislature" and therefore had suffered "no impairment of vested pension rights." (*Id.* at p. 818.) Notably, while *Miller* stated "the right to pension benefits vests upon the acceptance of employment," (*id.* at p. 815) it also explained "[p]ension rights, unlike tenure of civil service employment, are deferred compensation earned *immediately upon the performance of services* for a public employer." (*Id.* at p. 814, italics added.)

Similarly, *Betts* concerned a statutory change in the calculation of pension benefits occurring after a former state treasurer left office, but before he retired and applied for benefits. (*Betts*, *supra*, 21 Cal.3d at p. 862.) The former state officer asserted he was entitled to monthly pension benefits based on the highest salary received by the current treasurer—the law in effect while he was in office—rather than the new formula based on the highest salary he had received while in office. (*Ibid.*) Thus, the issue was not when pension benefits vested, but whether the former state officer had a vested contractual right to benefits earned under the earlier, more favorable, formula. The high court concluded he was entitled to benefits based on the more favorable formula in effect during his term in office, holding it was the measure of the official's "reasonable pension expectations." (*Id.* at p. 867.)

As numerous cases make clear, "acceptance of employment" essentially means the commencement of employment—that is, going on the payroll, providing services to the

10

employer, and making contributions, if required, towards the benefits associated with the position.  (See, e.g., *White v. Davis* (2003) 30 Cal.4th 528, 566 ["once a public employee has accepted employment and performed work for a public employer, the employee obtains certain rights"]; *Olson v. Cory* (1980) 27 Cal.3d 532, 540 (*Olson*) [" 'An employee's contractual pension expectations are measured by benefits which are in effect not only when employment commences, but which are thereafter conferred. . . .' [¶] . . . A judge entering office for the first time on or after [the effective date of the amendment] will be governed by the statute as amended."]; *In re Marriage of Brown* (1976) 15 Cal.3d 838, 845 ["we held in *Dryden v. Board of Pension Commrs. . . .* that an employee acquires a property right to pension benefits when he enters upon the performance of his employment contract"]; *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 852, 855 [though court had "stated in two recent decisions" that pension "vests upon acceptance of employment" court characterizes rule as vesting when employee "has performed substantial services for his employer"]; *French v. French* (1941) 17 Cal.2d 775, 777, overruled on another ground in *In re Marriage of Brown*, at p. 841 ["The *Dryden* case concerned the rights of a policeman in a pension fund to which he had made contributions while he was on active duty.  It was held that by the provisions of the city charter, under which that fund was created and maintained, the right to a pension was an integral part of the contract of employment and became a vested right at the time the employment began."]; *Dryden v. Board of Pension Commrs.* (1936) 6 Cal.2d 575, 579, citing *O'Dea v. Cook* (1917) 176 Cal. 659, 661–662 ["where, as here, services are rendered under such a pension statute, the pension provisions become a part of the contemplated compensation for those services and so in a sense a part of the contract of employment itself"], and *Aitken v. Roche* (1920) 48 Cal.App. 753, 755 ["it is correctly stated that the right to pension is a vested one, and that it enters into the contract of employment when a man enters the police department"]; *Deputy Sheriffs' Assn. of San Diego County v. County of San Diego* (2015) 233 Cal.App.4th 573, 579 (*Sheriffs' Association*) [" ' "[t]he contractual basis of a pension right is the exchange of an

11

employee's services for the pension right offered by the statute" and thus " '[f]uture employees do not have a vested right in any particular pension plan.' " ' "].)

As Division Two of this district recently explained, "it is commonly said that a public employee has pension rights that 'vest' on the first day of employment [citation], or in the less precise phrasing used by plaintiffs, 'upon acceptance of employment.' (*Betts* [, *supra*,] 21 Cal.3d [at p.] 863. . . .) We say less precise because, unlike professional sports, there are no signing bonuses in public service. The actual moment of vesting comes with the commencement of work, which gives rise to ' "the right to the payment of salary which has been earned." ' " (*Marin Association of Public Employees v. Marin County Employees' Retirement Assn.*, *supra*, 2 Cal.App.5th at p. 695, fn. 17, italics omitted, quoting *Miller*, *supra*, 18 Cal.3d at p. 815.)

In short, no case cited by appellants, nor any of which we are aware, suggests, let alone holds, that merely being elected to fill an office gives rise to a vested right in any of the benefits associated with that office as of the date the individual is elected. Rather, vested rights arise when an individual actually assumes office and commences his or her public employment.

Nor can appellants rely on respondents' initial mistaken application of JRS II as giving rise to a vested right in pre-PEPRA JRS II retirement benefits. In *Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864 (*Medina*), for example, several county employees who changed positions were no longer legally entitled to enhanced "safety member[]" retirement benefits. (*Id.* at p. 866.) Nevertheless, the retirement system continued to treat them as eligible for the enhanced benefits. (*Id.* at pp. 867–868.) When the mistake was finally discovered and corrected, the affected employees filed a petition for writ of mandate, claiming equitable estoppel and a vested right in the enhanced benefits for which they were previously qualified. (*Id.* at pp. 867–868, 871.) The trial court denied the petition. (*Id.* at p. 868.) The Court of Appeal affirmed, explaining "[a]ny purported contract to give appellants the pension benefits of safety members was invalid, and thus the vested rights doctrine does not apply." (*Id.* at p. 871.) The mistake

12

in continuing to treat them as eligible for the enhanced benefits was "the equivalent of attempting to form an unauthorized contract." (*Id.* at p. 872.)

Like reasoning applies here. Any mistakes by system administrators in the application of JRS II and PEPRA cannot create vested rights in contravention of the terms of these statutes. There is "no vested right in an erroneous classification." (*Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567, 586 (*Crumpler*).)

We therefore conclude appellants did not, at the time of their election, obtain a vested right in the retirement benefits provided by pre-PEPRA JRS II. Rather, they obtained a vested right to retirement benefits upon entering into their judicial offices, which occurred after PEPRA's effective date.

### No Estoppel to Comply with PEPRA

Appellants claim respondents should, in any case, be estopped from excluding them from pre-PEPRA JRS II because state personnel told them several times PEPRA did not apply to them and for more than a year the state treated them as members of pre-PEPRA JRS II. While we certainly sympathize with appellants' frustration over the erroneous information with which they were provided, respondents cannot be estopped from correcting a legal mistake and ensuring that JRS II is managed in conformance with the operative statutes, including PEPRA.

"The doctrine of equitable estoppel is founded on notions of equity and fair dealing and provides that a person may not deny the existence of a state of facts if that person has intentionally led others to believe a particular circumstance to be true and to rely upon such belief to their detriment. [Citation.] ' "Generally speaking, four elements must be present in order to apply the doctrine. . . : (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' " (*City of Oakland v. Oakland Police and Fire Retirement System* (2014) 224 Cal.App.4th 210, 239–240 (*City of Oakland*), quoting *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 257.)

13

"Where, as here, a party seeks to invoke the doctrine of equitable estoppel against a governmental entity, an additional element applies. That is, the government may not be bound by an equitable estoppel in the same manner as a private party unless, 'in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' (*Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496–497. . . .)" (*City of Oakland*, *supra*, 224 Cal.App.4th at p. 240.)

Moreover, even when equitable estoppel against a public entity might otherwise be warranted, it is improper when application of the doctrine would contravene a "statutory limitation." (*City of Oakland*, *supra*, 224 Cal.App.4th at p. 243, citing cases; *Chaidez v. Board of Administration Etc.* (2014) 223 Cal.App.4th 1425, 1431–1432 [pensioner misinformed and unaware of statute reducing his pension benefits because of time he spent as an elected official, could not invoke equitable estoppel to obtain expected benefits]; *Medina*, *supra*, 112 Cal.App.4th at pp. 869–871 [employees who no longer met statutory definition of "safety members," could not invoke equitable estoppel based on respondents' mistake to remain eligible for enhanced retirement benefits].)

As we have discussed, PEPRA imposes explicit limitations on judicial retirement benefits under JRS II. Accordingly, even if the retirement system administrator mistakenly made assurances to appellants that PEPRA would not apply to them and they reasonably relied on those assurances, appellants cannot invoke estoppel to prevent the state from correcting that mistake and properly applying the JRS II/PEPRA statutory scheme.

Appellants correctly point out that *if* the state or CalPERS Board of Administration had discretion under JRS II and PEPRA to provide them with pre-PEPRA benefits, compelling them to provide such benefits would not require them to act in excess of statutory authority, and equitable estoppel might be available. (See *City of Oakland*, *supra*, 224 Cal.App.4th at p. 245; *Medina*, *supra*, 112 Cal.App.4th at pp. 870–

14

871; *Crumpler*, *supra*, 32 Cal.App.3d at p. 584.) Appellants suggest section 75505 provides the needed administrative latitude.

Section 75505 provides in pertinent part: "To the extent applicable, the Board of Administration of the Public Employees' Retirement System [PERS] shall administer [JRS II] in conformance with [PEPRA] to the same extent and with the same effect as if the provisions of the act are contained in [JRS II]. If the Board of Administration of [PERS] determines that there is a conflict between the provisions of [PEPRA] and [JRS II], the provisions of [PEPRA] shall control." (§ 75505, subd. (a).) This provision plainly compels compliance with PEPRA, and while it may give PERS some initial say-so as to the existence of a conflict between JRS II, as enacted, and PEPRA, it categorically resolves that conflict in favor of PEPRA. It in no way grants the state any authority to disregard PEPRA, and as we have discussed, the state would have to ignore PEPRA to grant appellants pre-PEPRA JRS II benefits.

Appellants further contend that whatever PEPRA may say, that statutory scheme is ultimately of no consequence because the initial assurances they were given about retirement benefits under pre-PEPRA JRS II, were made before PEPRA went into effect. This does not change the fact that requiring respondents to treat appellants as coming within pre-PEPRA JRS II would require respondents to act beyond the legal authority they now have. In addition, JRS II, even as originally enacted, reserved to the Legislature the power to increase the base 8 percent rate of contribution as "appropriate" and to "reduce" pension benefits. (§ 75603 ["The Legislature reserves the right to increase the rates of contribution prescribed by Sections 75601 and 75602 in the amounts as it may find appropriate."]; § 75604 ["The Legislature reserves the right to reduce any benefits applicable to any person who becomes a judge who is subject to this chapter."]; cf. *Walsh v. Board of Administration* (1992) 4 Cal.App.4th 682, 704 [when Legislature has power to diminish pension benefits, it may do so without impairing vested rights, though it may not terminate them outright].) No plan administrator could tie the Legislature's hands in these respects, and thus any reliance by appellants on a promise of

15

certain benefits by an administrator would have been unreasonable. (See *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 543–544.)

The few cases in which the courts have applied estoppel with respect to a government benefit are distinguishable. *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, involved widows of former police and fire department employees, some of whom did not file a claim for a share of their husbands' pension benefits because they were advised by the Board of Pension Commissioners that they were "not eligible to receive a pension of any kind." (*Id.* at pp. 300, 303.) The board so advised based on a change to the city charter, requiring a widow to have been married to a pensioner for one year prior to the date of his retirement, rather than one year prior to his death, in order to receive pension benefits. (*Id.* at pp. 301, 303.) Following a Supreme Court decision that the city charter amendment could not be applied to widows whose husbands had retired prior to the effective date of the amendment, the widows filed suit. (*Id.* at pp. 301–302.) At this point, the City of Los Angeles maintained the widows' claims were barred by the applicable statute of limitations, and that equitable estoppel did not apply. (*Id.* at pp. 304–305.) The Supreme Court disagreed. It concluded the "great magnitude" of a "widow's right to a continuing pension upon the death of her retired husband," the City's "unreasonable" conduct in advising the widows that filing a claim would be unavailing, and the fact the City "might have reasonably expected" its advice would induce the widows not to file a claim, estopped the City from asserting the statute of limitations. (*Id.* at pp. 310–311.) The court concluded estoppel did not apply, however, to prevent the City from asserting the six-month retroactive claim provision of the city charter, under which retroactive pension benefits are limited to six months prior to the filing of a claim. (*Id.* at p. 311.) As to that provision, the court held the City's advice was not unreasonable, and retroactive accruals were not of such great magnitude. (*Ibid.*)

In *Crumpler*, the appellants were hired by a city police department as animal control officers. (*Crumpler*, *supra*, 32 Cal.App.3d at p. 570.) At the time of their employment, they were classified as "local safety members," and made contributions to the retirement system based on that classification. (*Id.* at pp. 570–571.) Safety members

could retire at age 55 with "substantial benefits," while non-safety "miscellaneous" members could retire at age 55 but would not receive "substantial benefits" until age 65. (*Id*. at p. 572.) Following an investigation, the board determined appellants had been mistakenly classified as safety members rather than miscellaneous members. (*Id.* at p. 571.) On appeal, the Court of Appeal concluded the board properly reclassified appellants, but was estopped from doing so "*nunc pro tunc* as of the date they became members of the system." (*Id*. at p. 574.) The members could only be reclassified prospectively. (*Ibid*.)

Neither of these cases, nor any case of which we are aware, employed principles of estoppel to afford a public employee a benefit that otherwise would directly contravene a statutory or constitutional limitation.

### *No Denial of Equal Protection*

Appellants also mount an equal protection challenge to PEPRA. They assert the Act improperly distinguishes between them and (a) judges appointed after PEPRA's passage but who assumed office before its effective date, and (b) judges elected in 2012 but who were previously public employees and thus were already members of a public retirement system.

Appellants maintain we should review these classifications under the stringent, "strict scrutiny" standard. This standard applies, say appellants, because PEPRA impacts a "fundamental right," namely their assertedly vested right to retirement benefits under pre-PEPRA JRS II. (See *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 480–481 [generally discussing strict scrutiny review in equal protection challenge].) However, we have concluded appellants have no vested right in pre-PEPRA JRS II benefits.

But even if we were to apply strict scrutiny in evaluating the validity of the classifications post-PEPRA JRS II creates,[6] there is simply no question that the difference

---

[6] We note that "[c]ourts generally have applied a rational basis test in evaluating equal protection claims based on differing treatment of members of public employee retirement plans." (*Hudson v. Board of Administration* (1997) 59 Cal.App.4th 1310,

17

in treatment is justified by a compelling state interest—namely, the urgency of implementing public pension reform as quickly as possible and the necessity of drawing a clear line as to when these reforms would become operative, giving due regard to the "vested rights" doctrine uniquely applicable to public employment. PEPRA was designed to address the critical issue of unfunded public pension liabilities. " 'In 2011, the Little Hoover Commission advised the Governor and the Legislature: "California's pension plans are dangerously underfunded, the result of overly generous benefit promises, wishful thinking and an unwillingness to plan prudently. Unless aggressive reforms are implemented now, the problem will get far worse, forcing counties and cities to severely reduce services and [lay off] employees to meet pension obligations." . . . The situation was described as "dire," "unmanageable," a "crisis" that "will take a generation to untangle," and "a harsh reality" that could no longer be ignored.' " (*San Joaquin County Correctional Officers Assn. v. County of San Joaquin* (2016) 6 Cal.App.5th 1090, 1095, review withdrawn (Mar. 15, 2017), quoting *Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn.*, *supra*, 2 Cal.App.5th at p. 681.) There is certainly a compelling state interest in resurrecting the actuarial viability of public retirement systems and avoiding the draconian consequences that will occur if public pension liabilities remain underfunded.[7]

Appellants also rely on an observation made in *Olson*, *supra*, 27 Cal.3d 532. While acknowledging that *Olson* held "the Legislature may create different salary levels for different officers or employees performing similar duties," appellants point out the Supreme Court noted that "a further question arises whether an enactment which has immediate constitutional application in some instances but only prospective application in others, satisfies constitutional requirements." (*Id.* at p 544.) *Olson* addressed 1976 legislation limiting judicial cost-of-living increases to 5 percent per year, rather than the

1329; see *Sturgeon v. County of Los Angeles* (2010) 191 Cal.App.4th 344, 354–355 (*Sturgeon II*) ["disparity in judicial compensation is not subject to strict scrutiny"].)

[7] Because we conclude the classes of judges created by PEPRA can survive even strict scrutiny review, they necessarily pass muster under "rational basis" analysis.

18

actual increase in the California Consumer Price Index, to which judges had previously been entitled. (*Id*. at pp. 536–537, 540.) The legislation sought to maintain judicial salaries at the September 1, 1976 level for 22 months, and then, as of July 1, 1978, to limit prospective salary increases to 5 percent. (*Id*. at p. 537.) Because judicial pensions were "based on a specified percentage of the salary of a judge holding the judicial office to which the retired or deceased judge was last elected or appointed," the 1976 legislation limiting judicial salary increases, in turn, diminished pension benefits. (*Id.* at p. 541.)

The Supreme Court concluded the new legislation could not be constitutionally applied to "a judge or justice during any term of office, or unexpired term of office of a predecessor, if the judge or justice served some portion thereof (a 'protected term') prior to 1 January 1977, and . . . a judicial pensioner whose benefits are based on some proportionate amount of the salary of the judge or justice occupying that office." (*Olson*, *supra*, 27 Cal.3d at p. 546.) However, it could be applied to judges already in office but commencing a new term after the effective date of the legislation, and judges entering office for the first time after the effective date. (*Id*. at p. 540.)

The court explained that "A judge entering office is deemed to do so in consideration of–at least in part–salary benefits then offered by the state for that office. If salary benefits are diminished by the Legislature during a judge's term, or during the unexpired term of a predecessor judge (see Cal. Const., art. VI, § 16; . . . §§ 71145, 71180), the judge is nevertheless entitled to the contracted-for benefits during the remainder of such term. The right to such benefit accrues to a judge who served during the period beginning 1 January 1970 to 1 January 1977, whether his term of office commenced prior to or during that time period. 'An employee's contractual pension expectations are measured by benefits which are in effect not only when employment commences, but which are thereafter conferred during the employee's subsequent tenure.' [Citation.] [¶] A judge who completes one term during which he was entitled to unlimited cost-of-living increases and elects to enter a new term has impliedly agreed to be bound by salary benefits then offered by the state for the different term. Thus, while a judge is entitled to a salary based on [the prior statute] throughout a term ending, for

19

instance, in 1978, his salary for a new term beginning on or after the effective date of the 1976 amendment–1 January 1977–will be governed by the statute as amended. Likewise, a judge entering office for the first time on or after 1 January 1977, including a judge entering upon his own term or upon the unexpired term of a predecessor judge, cannot claim any benefit based on [the former section] before the 1976 amendment." (*Olson*, *supra*, 26 Cal.3d at pp. 539–540, italics omitted.)

As to judicial pensioners, the high court explained "a judicial pensioner cannot claim impairment of a vested right arising out of the 1976 amendment except when the judge holding the particular judicial office could also claim such an impairment. The resolution of pensioner vested rights, then, is dependent on the foregoing resolution of judges' vested rights left unimpaired by the 1976 amendment." (*Olson*, *supra*, 26 Cal.3d at pp. 541–542, italics omitted.)

Thus, *Olson* expressly allowed differing compensation for judges based on when they entered office. (*Olson*, *supra*, 27 Cal.3d at pp. 546–547.) And, it concluded that, to the extent the enactment suffered from a *temporary* constitutional defect as to judges who had already entered office, "its applicability is merely delayed until such time as the constitutional bar ceases to exist." (*Id.* at p. 545.) Where appellants' analysis falls short is that, unlike the judges in *Olson*, they had no vested right in any of the emoluments of the judicial offices they had not yet assumed.

### *No Violation of the Non-Diminution Clause*

Appellants also challenge the provisions of PEPRA that allow for fluctuating contributions. Because increased contributions are deducted from a judge's monthly paycheck, and thereby reduce his or her monthly take home pay, appellants claim such increases violate our state's non-diminution clause (Cal. Const., art. III, § 4).[8]

---

[8] This issue is not concerned with the initial pension contributions PEPRA required from the petitioning judges—which were significantly higher than their contributions would have been under pre-PEPRA JRS II. Rather, this issue concerns whether or not, as sitting judges, they can be subject to further contribution increases under PEPRA's contribution formula.

PEPRA specifies that an employee's pension contribution must be "at least 50 percent of the normal cost rate for that defined benefit plan." (§ 7522.30, subd. (c).) PEPRA also defines "normal cost" as meaning "the portion of the present value of projected benefits under the defined benefit that is attributable to the current year of service, as determined by the public retirement system's actuary according to the most recently completed valuation. For the purpose of determining normal cost, the system's actuary may use a single rate of contribution or an age-based rate of contribution as is applicable to that retirement system." (§ 7522.04, subd. (g).) "The 'normal cost rate' shall mean the annual actuarially determined normal cost for the plan of retirement benefits provided to the new member and shall be established based on the actuarial assumptions used to determine the liabilities and costs as part of the annual actuarial valuation." (§ 7522.30, subd. (b).) What this formula has meant for the petitioning judges is that, in year one, they had a 15.25 percent contribution rate, which increased to an unspecified rate the following year.

California's non-diminution clause broadly provides that: "Except as provided in subdivision (b), salaries of elected officers may not be reduced during their term of office." (Cal. Const., art. III, § 4 subd. (a).) Subdivision (b) states, specifically as to judges, that: "Beginning on January 1, 1981, the base salary of a judge of a court of record shall equal the annual salary payable as of July 1, 1980, for that office had the judge been elected in 1978. The Legislature may prescribe increases in those salaries during a term of office, and it may terminate prospective increases in those salaries at any time during a term of office, but it shall not reduce the salary of a judge during a term of office below the highest level paid during that term of office." (*Id.*, § 4 subd. (b).)

Such provisions are a common feature of our constitutional form of democracy. As the United States Supreme Court has explained with respect to the analogous federal clause,[9] "the Compensation Clause . . . helps to guarantee what Alexander Hamilton

_____

[9] The federal non-diminution clause (frequently called the Compensation Clause) provides in pertinent part: "Judges . . . shall, at stated Times, receive for their Services, a

21

called the 'complete independence of the courts of justice.' [Citation.] Hamilton thought these guarantees necessary because the Judiciary is 'beyond comparison the weakest of the three' branches of government. [Citation.] It has 'no influence over either the sword or the purse,' . . . 'no direction either of the strength or of the wealth of the society.' [Citation.] It has 'neither FORCE nor WILL but merely judgment.' " (*U.S. v. Hatter* (2001) 532 U.S. 557, 567–568 (*Hatter*).) "And Hamilton knew that 'a power over a man's subsistence amounts to a power over his will.' [Citation.] For this reason, he observed, 'next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support.' " (*Id*. at p. 586, italics omitted.) "[T]hese guarantees of compensation and life tenure exist, 'not to benefit the judges,' but 'as a limitation imposed in the public interest.' [Citation.] They 'promote the public weal,' [citation] . . . by helping to secure an independence of mind and spirit necessary if judges are 'to maintain that nice adjustment between individual rights and governmental powers which constitutes political liberty.' " (*Ibid*.; see *Olson*, *supra*, 27 Cal.3d at pp. 543–544 ["Security of both tenure and subsistence are important factors in creating and maintaining an independent judiciary."].)

The parties have cited no California case, nor are we aware of one, that has considered whether an increased payroll deduction, resulting in a commensurate reduction in a judge's take-home pay, violates our state's non-diminution clause. However, the United States Supreme Court and a number of other state courts have addressed this issue in connection with other non-diminution clauses, reaching varying conclusions.

In *Hatter*, the United States Supreme Court considered whether Medicare and Social Security tax mandates, resulting in new deductions from the paychecks of sitting federal judges, violated the federal non-diminution clause. (*Hatter*, *supra*, 532 U.S. at pp. 560–561.) Notably, the high court did not adopt a bright line rule automatically

---

Compensation, which shall not be diminished during their Continuance in Office." (U.S. Const., art. III, § 1.)

22

exempting sitting judges from new tax deductions.  Rather, the court focused on the nature and impact of the taxes and reached different conclusions as to the new Medicare and the new Social Security tax burdens.

The new Medicare law extended Medicare eligibility to all new and current federal employees, including sitting federal judges, and imposed a like tax.  (*Hatter*, *supra*, 532 U.S. at pp. 561–562.)  Repudiating its own prior authority, the high court held "the Compensation Clause does not forbid Congress to enact a law imposing a nondiscriminatory tax (including an increase in rates or a change in conditions) upon judges, whether those judges were appointed before or after the tax law in question was enacted or took effect."  (*Id.* at p. 571.)  "There is no good reason," said the court, "why a judge should not share the tax burdens borne by all citizens."  (*Ibid.*)  And while conceding that the court had "held that the Legislature cannot *directly* reduce judicial salaries even as a part of an equitable effort to reduce *all* Government salaries . . . a tax law, unlike a law mandating a salary reduction, affects compensation indirectly, not directly."  (*Ibid.*)  "And those prophylactic considerations that may justify an absolute rule forbidding direct salary reductions are absent here, where indirect taxation is at issue. In practice, the likelihood that a nondiscriminatory tax represents a disguised legislative effort to influence the judicial will is virtually nonexistent.  Hence, the potential threats to judicial independence that underlie the Constitution's compensation guarantee cannot justify a special judicial exemption from a commonly shared tax. . . ."  (*Ibid.*)

The new Social Security tax provisions, however, were another matter.  Because of the peculiar way in which these provisions worked, of all the federal officials that had formerly been excepted from Social Security, only federal judges were unable to avoid "any additional financial obligation as a result of joining Social Security."  (*Hatter*, *supra*, 532 U.S. at pp. 562–563.)  Rejecting the assertion that the non-diminution clause protects judges "only against a reduction in stated salary, not against indirect measures that only reduce take-home pay" (*id.* at p. 576), the court held the new tax burden could not be imposed on sitting judges.  (*Id.* at p. 578.)  The court identified "four features" of

23

the new law, which "taken together," led it to conclude the law discriminated against judges "in a manner" forbidden by the non-diminution clause. (*Id.* at p. 572.)

First, the high court identified "federal employees" as the class being impacted by the new tax law. (*Hatter*, *supra*, 532 U.S. at p. 572.) Second, the new law "in effect imposed a new financial obligation upon sitting judges, but did not impose a new financial burden upon any other group of (then) current federal employees." (*Ibid.*) Third, the law "adversely affected" most sitting judges, as most had already qualified for Social Security before taking the bench. (*Id.* at p. 573.) Thus, the "new law imposed a substantial cost on federal judges with little or no expectation of substantial benefit for most of them." (*Ibid.*) Fourth, the government's justification for the burden on judges was "to make up for the fact that the judicial retirement system is basically a noncontributory system, while the system to which other federal employees belonged was a contributory system." (*Id.* at pp. 573–574.) However, the fact the federal judicial retirement system is noncontributory goes hand in hand with the federal judiciary's life tenure provisions. Thus, the new tax burden was not only unrelated to the noncontributory judicial retirement system, but it targeted one of the fundamental attributes of the federal judiciary. (*Id.* at pp. 575–576.) "Taken together," these four factors "reveal[ed] a law that is special—in its manner of singling out judges for disadvantageous treatment, in its justification as necessary to offset advantages related to constitutionally protected features of the judicial office, and in the degree of permissible legislative discretion that would have to underlie any determination that the legislation has 'equalized' rather than gone too far." (*Id.* at p. 576.)

Relying in part on *Hatter*, the Supreme Court of New Jersey concluded a more than 400 percent increase in pension contributions and a more than 100 percent increase in health care premiums, imposed on sitting judges without a commensurate salary increase, violated the state's non-diminution clause.[10] (*DePascale*, *supra*, 211 N.J. at

---

[10] New Jersey's non-diminution clause in effect when *DePascale* was decided provided that justices and judges " 'shall receive for their services such salaries as may be

pp. 42–43, 47.) The New Jersey court observed that its state legislature had never before imposed contribution requirements on sitting judges without a corresponding increase in judicial salaries, and, thus, had "carefully assured that no diminution in salary occurred." (*Id.* at p. 54.) While the court recognized that *Hatter* had allowed deductions for a non-discriminatory tax "borne by all citizens," it concluded this was the sole exception sanctioned by the Supreme Court. (*Id.* at pp. 60–61.) "The United States Supreme Court has never given any signal that even an indirect reduction in a judge's salary during the term of his appointment would be tolerable," save for a general, nondiscriminatory tax. (*Id.* at p. 62.) The court further observed that the state could not "point to another high court in any jurisdiction with a similar constitutional no-diminution clause that has upheld legislation reducing the take-home salary or compensation of judges during their appointment to office, by compelling greater pension or health care contributions." (*Id.* at p. 64; see *Hudson v. Johnstone* (Ala. 1983) 660 P.2d 1180, 1181–1183, 1185 [interpreting "term" of judicial office to include additional terms served through retention elections, and holding non-diminution clause prohibited state from requiring sitting judges, for the first time, to make pension contributions (at 7 percent of their base salary)[11]]; *Carper v. Stiftel* (Del. 1977) 384 A.2d 2, 6 [holding non-diminution clause prohibited state from requiring sitting judges to pay more than $1,000 in additional pension contributions for unchanged benefits[12]].)

However, more recently, New York's high court concluded a reduction in state contributions to health benefits (requiring a commensurate increase in employee

provided by law, which shall not be diminished during the term of their appointment.' " (*DePascale v. State* (N.J. 2012) 211 N.J. 40, 42–43, 47; 47 A.3d 690 (*DePascale*).)

[11] Alaska's non-diminution clause provides in pertinent part: "Compensation of justices and judges shall not be diminished during their terms of office, unless by general law applying to all salaried officers of the State." (*Hudson v. Johnstone*, *supra*, 660 P.2d at p. 1182, italics omitted.)

[12] Delaware's non-diminution clause provides: " 'No law shall extend the term of any public officer or diminish his salary or emoluments after his election or appointment.' " (*Carper v. Stiftel*, *supra*, 384 A.2d at p. 6.)

contributions) did not violate the state's non-diminution clause.[13] (*Bransten v. State of New York* (2017) 30 N.Y.3d 434, 436 (*Bransten*).) Participation in the state's health insurance program was optional, and employees had an array of options to choose from. (*Id.* at p. 434.)

The New York court reiterated the importance of the state's constitutional non-diminution clause: "As with the similar prohibition contained in the federal Compensation Clause, the anti-diminution language was intended to protect judges from the corruptive force of financial uncertainty, in order to maintain an able and independent judiciary, free of coercion from the other branches." (*Bransten*, *supra*, 30 N.Y.3d at p. 439.) And it recognized that "the legislature may not enact laws that directly diminish judicial compensation or accomplish the same result by singling out judges for disadvantageous treatment that indirectly diminishes their pay." (*Ibid.*)

Following the analytical template of *Hatter*, the New York court first considered whether the reduced state contributions constituted a "direct" diminution of judicial compensation. (*Bransten*, *supra*, 30 N.Y.3d at p. 439.) Reviewing the state's prior case law, the court concluded constitutionally protected judicial "compensation" refers "to a judge's salary and any additional monies that serve as a permanent remuneration for costs necessarily incurred in fulfillment of a judge's judicial obligations." (*Id.* at p. 440.) Health care benefits, said the court, did not fall within this definition, noting that a special commission on judicial compensation had separately referred to monetary compensation and " 'non-salary benefits.' " (*Id.* at p. 441.) The court also could discern no intent on the part of the legislature that, in extending such non-salary benefits, it had intended state contributions "to be treated as a permanent addition to a judicial salary." (*Ibid.*) In short, while reduced state contributions "would increase a participating judge's share of the cost associated with the chosen health care plan, such an increase is not the equivalent of a

---

[13] New York's non-diminution clause provides that the compensation of sitting and retired judges "shall be established by law and shall not be diminished during the term of office for which [a judge] was elected or appointed." (New York Const., art. VI, § 25, subd. (a).)

26

direct reduction in judicial compensation. It is a cost that is voluntarily assumed by the participating judges, and affects salary only indirectly." (*Id*. at p. 443.)

The court next considered whether the reduced contributions constituted an "indirect" diminution of judicial compensation, and construed *Hatter* as allowing a "cost increase that indirectly affects judicial compensation" so long as "the increase does not target judges for disadvantageous treatment." (*Bransten*, *supra*, 30 N.Y.3d at p. 443.) Considering the "four factors" that had guided the United States Supreme Court, the New York court concluded the state law at issue did "not 'reveal a law that is special' in how it disadvantages judges." (*Id.* at pp. 445–446; see *Cook v. Chilton* (Ky. 1965) 390 S.W.2d 656, 657 [increasing pension contribution rate of sitting judges, from 2.5 percent to 4 percent, did not violate compensation clause; "obvious purpose" of a judicial retirement system "is to promote independence and security" and it "would be a gross distortion" of the provisions of the compensation clause "to hold they were intended to forbid a legislative act designed to achieve the very same objectives as the constitutional prohibitions"].)

While each of these cases examined the scope and meaning of a non-diminution clause, none dealt with the particular circumstances presented here. First, these cases involved statutory provisions that impacted judges for the first time *during* their terms of office. Here, in contrast, PEPRA took effect prior to the time appellants assumed their judicial offices. Second, none of these cases involved contributions to a retirement system, like post-PEPRA JRS II, which (a) is mandatory and (b) fixes contributions by way of a formula that applies to virtually all public employee retirement systems and allows for adjustment based on market performance and actuarial data. In other words, there appears to be no case from any jurisdiction that has considered whether the kind of contribution formula that makes PEPRA retirement systems far more actuarially sound than earlier systems, results in a constitutionally impermissible reduction in judicial salaries when that formula calls for an increase in employee contributions.

Nevertheless, in our view, the United States Supreme Court's decision in *Hatter* and the New York high court's recent decision in *Bransten* provide some guidance on the

27

issue at hand. We are particularly persuaded by the Supreme Court's view, as explained in *Hatter*, that a new deduction from take home pay does not *automatically* violate the non-diminution clause. We are also persuaded that any increased contributions required under PEPRA's contribution formula are, as described in both *Hatter* and *Bransten*, *indirect* reductions in a judge's salary. Indeed, as respondents point out, under JRS II, even as amended by PEPRA, a judge's pension contributions are essentially banked for his or her future withdrawal, either as a lump sum with interest or as part of a defined monthly benefit. So, while part of his or her salary is set aside for payment at a later time, no part of a judicial salary is eliminated.

We are further persuaded that the "four factor" template the Supreme Court set forth in *Hatter*, and which the New York court applied in *Bransten*, provides a sensible means of determining whether a financial obligation imposed on sitting judges runs afoul of the non-diminution clause. Applied here, this template yields the following points:

First, given the breadth of PEPRA, the "appropriate" comparison group is virtually all other state employees eligible to participate in a public retirement system. While this is akin to the federal employee group covered by the Social Security tax disapproved, as to sitting federal judges in *Hatter*, it is also equivalent to the New York state employee group impacted by the reduction in state contributions (and commensurate increase in employee contributions) considered and approved in *Bransten*.

Second, unlike the unique and singular financial impact on federal judges of the Social Security tax at issue in *Hatter*, PEPRA's contribution formula has widespread effect and does not financially affect only judges.

Third, unlike in *Hatter*, where nearly all federal judges were already covered by Social Security due to prior employment and there was no need for them to be brought into the system by the new legislation, a California judge becomes eligible for retirement benefits under JRS II only on assuming judicial office.

Fourth, unlike in *Hatter*, where the government's justification for the singular financial impact on federal judges ("to make up for the fact that the judicial retirement

28

system is basically a noncontributory system")[14] directly impacted fundamental attributes of the federal judiciary, the state legislature enacted PEPRA in order to address the dire economic problems facing all public retirement systems and to make some headway towards returning these systems to actuarial sound footing. Furthermore, unlike the federal judicial retirement system, California's judicial retirement system has always been a contributory system. Accordingly, unlike the justification for the new Social Security tax at issue in *Hatter*, the justification for PEPRA's challenged contribution formula does not cut to a core attribute of the state's judiciary.

Thus, "[t]aken together," the four factors identified in *Hatter*, do not reveal a law that "is special—in its manner of singling out judges." (*Hatter*, *supra*, 532 U.S. at p. 576.) On the contrary, state judges are bearing the same financial obligation imposed on virtually every other state employee eligible to participate in a state retirement system. As the Little Hoover Commission found in its study leading to the enactment of PEPRA, this burden is a matter of economic imperative. And the fiscal integrity of the state's retirement systems, including JRS II, cannot be restored without it. (E.g., Little Hoover Com., Public Pensions For Retirement Security (Report No. 204, Feb. 2011) pp. i-ix.)

Our conclusion that PEPRA's contribution formula does not run afoul of the non-diminution clause is also consistent with a line of cases from other jurisdictions, of which *State ex rel. Mack, Judge v. Guckenberger, Aud.,* (Ohio 1942) 39 N.E.2d 840, is a leading example. In *Guckenberger*, the Ohio Supreme Court considered whether a state law that set the compensation for common pleas judges on the basis of local population (as determined by federal census) violated the state's compensation clause, and specifically, the provision barring increases in compensation during a judge's term. (*Id*. at p 842.) This law had the effect of increasing judicial salaries during a term of office, when a new census showed an increase in local population. Observing that "[e]very reasonable presumption must be indulged in favor of the constitutionality of a statute" (*id.* at p. 843), the Ohio court concluded the specified method of determining judicial compensation did

---

[14] (*Hatter*, *supra*, 532 U.S. at pp. 573–574.)

not violate the compensation clause. "[T]here is no inhibition," said the court, "against the Legislature fixing such compensation before the term begins on a basis which may vary it in amount as time advances, provided that *basis*, within the contemplation and understanding of both the judge and the people who elect him, is fixed, certain and unchangeable during his term." (*Id.* at p. 845.) The court also pointed out that because the manner in which the judges' compensation was determined was fixed prior to the commencement of their terms, the "salutary purposes [of the state's compensation clause] are fully and effectually preserved by the terms of the present statute, albeit the compensation of the judge is made variable, from and after the last federal census becoming effective during his term." (*Id.* at pp. 843–844.)

In *Stiftel v. Malarkey* (Del. 1977) 384 A.2d 9, the Delaware Supreme Court described *Gockenberg* as aligning Ohio with "the roster of states whose highest courts had already adopted the rule that changes in compensation generated under a fixed formula are not increases or decreases for purposes of constitutional restriction." (*Id.* at p. 16.) The Delaware court observed additional states had subsequently followed these precedents, and it applied the same reasoning in holding statutorily authorized cost of living adjustments were permissible and could not be eliminated during a judge's term of office. (*Ibid.*)

Much the same can be said about PEPRA's methodology for determining contribution rates. It is a methodology spelled out by statute (§§7522.04, 7522.30, 7522.32) and which was in effect prior to the commencement of the terms of the petitioning judges. Its application year in and year out, to virtually all employees that participate in a public retirement system, cannot be said to be at odds with the purposes of our state's non-diminution clause.

***No Impermissible Delegation of Legislative Authority over Salaries***

Appellants lastly contend PEPRA's contribution formula runs afoul of the constitutional mandate that only the Legislature is to "prescribe compensation for judges." (Cal. Const., art. VI, § 19.) Specifically, they object to the provisions stating that "the system's actuary may use a single rate of contribution or an age-based rate of

30

contribution as is applicable to that retirement system" (§ 7522.04, subd. (g)) and that the " 'normal cost rate' shall mean the annual actuarially determined normal cost for the plan of retirement benefits provided to the new member and shall be established based on the actuarial assumptions used to determine the liabilities and costs as part of the annual actuarial valuation." (§ 7522.30, subd. (b).)

Appellants acknowledge the Legislature may "make limited delegations of Constitutional authority," but claim the Legislature has failed, in PEPRA, to constrain "such a delegation" with " 'a sufficient standard,' " quoting *Sturgeon v. County of Los Angeles* (2008) 167 Cal.App.4th 630, 643 (*Sturgeon I*), superseded by statute as stated in *Sturgeon v. County of Los Angeles* (2015) 242 Cal.App.4th 1437, 1440.)

In *Sturgeon I*, a taxpayer challenged the validity of employment benefits (which included a mega-flex account, a professional development allowance, and a 401(k) matching plan) that Los Angeles County provided to its superior court judges and which were "in addition to" the compensation prescribed by the Legislature. (*Sturgeon I*, *supra*, 167 Cal.App.4th at pp. 635–636.) The court concluded the additional benefits were "compensation" within the meaning of article VI, section 19 of the California Constitution, which had not been prescribed by the Legislature. (*Sturgeon I*, at p. 657.) The *Sturgeon* court explained: "Under our constitutional scheme, judicial compensation is a matter of statewide concern and the Legislature must set policy with respect to all aspects of judicial compensation. . . . [T]he Legislature's obligation to 'prescribe judicial compensation' requires that it set forth standards or safeguards which assure that fundamental policy is implemented. . . . The obligation is not onerous, but does require that the Legislature consider the specific issue and, at a minimum, establish or reference identifiable standards." (*Ibid.*)

Following *Sturgeon I*, the Legislature promptly passed legislation, which the same taxpayer again challenged. This time, the court concluded the Legislature had adequately " 'prescribed' " the additional compensation. (*Sturgeon II*, *supra*, 191 Cal.App.4th at pp. 353–354.)

31

Unlike the situation the court confronted in *Sturgeon I*, the Legislature has, in PEPRA, "prescribed" the standards for calculating the "normal cost" of pension benefits. The fact that the Legislature has specified that "normal cost" is to be calculated by an actuary based on one of two rates of contribution (the specific problem appellants purport to find with the statute) does not mean the Legislature has unconstitutionally delegated its power to prescribe compensation. On the contrary, the Legislature has carefully "prescribed" the manner in which contribution rates are to be determined. (See *Kugler v. Yocum* (1968) 69 Cal.2d 371, 373 [ordinance specifying salaries for firefighters "shall be no less than the average of those of an adjoining city . . . does not unlawfully delegate legislative power because the power to legislate has been expressed and exerted in the enactment of the policy of such parity [and] future adjustment in salaries pursuant to that formula is no more than the automatic execution of that policy"]; *Martin v. County of Contra Costa* (1970) 8 Cal.App.3d 856, 859, 862 [legislation tying court employees' salaries and raises to their counterparts in the county "not an abdication of the Legislature's duty to prescribe the compensation"].)

**DISPOSITION**

The judgment is affirmed.

_____

                                        Banke, J.


We concur:


_____

Margulies, Acting P.J.


_____

Dondero, J.


A146855, *McGlynn et. al. v. State of California et. al*.

Trial Court:   San Francisco City and County Superior Court

Trial Judge:   Hon. Ernest H. Goldsmith

Counsel:

Beeson, Taylor & Bodine, APC, Teague P. Paterson and Costantin Kerestenzis for Plaintiffs and Appellants.

Leonard Carder, LLP, Arthur Wei-Wei Liou, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Tamar Pachter and Peter H. Chang, Deputy Attorneys; Sloan Sakai Yeung & Wong LLP, Timothy G. Yeung, for Defendants and Respondents.